In the

# United States Court of Appeals
## For the Seventh Circuit

No. 06-2483

FRANCISCO SALAS,

*Plaintiff-Appellant,*

*v.*

WISCONSIN DEPARTMENT OF CORRECTIONS,
RICHARD F. RAEMISCH, WILLIAM A. GROSSHANS,
DENISE A. SYMDON, AND LEANN MOBERLY,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 05-C-0399-C—**Barbara B. Crabb**, *Chief Judge.*

ARGUED MAY 3, 2007—DECIDED JULY 18, 2007

Before EASTERBROOK, *Chief Judge*, and FLAUM and
RIPPLE, *Circuit Judges*.

FLAUM, *Circuit Judge.* On March 19, 2004, the Wisconsin Department of Corrections ("DOC") terminated Francisco Salas, an eighteen-year employee. Claiming that his termination was motivated by discriminatory and retaliatory motives, Salas filed suit against the DOC and several individual defendants alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 & e-3, as well as 42 U.S.C. § 1983. On April 25, 2006, the district court granted the defendants summary judgment, holding that Salas could not bring his Title VII claims

because he did not timely file them with the EEOC and that no reasonable jury could find that the DOC had violated the Constitution by firing him. Salas appeals. For the following reasons, we affirm.

## I. BACKGROUND

Francisco Salas, a Hispanic male, began working at the DOC on January 27, 1986. From 1995 until he was terminated, Salas served as a senior probation and parole agent. Prior to his discharge, he was never disciplined and received various promotions. On March 19, 2004, the DOC terminated Salas for allegedly falsifying documents and failing to supervise an offender named Kevin Hageman. At the time of his termination, Salas was the only Hispanic male working in the DOC's Madison, Wisconsin office.

### A. The DOC's Decision to Terminate Salas

In order to understand the events that led to Salas' firing, some background on the operation of the department's probation program is necessary. Until the summer of 2002, the DOC contracted with a Colorado-based company called BI Corporation to supervise certain low-risk, non-violent offenders, like Hageman, by telephone ("the BI program"). The BI program required offenders to make scheduled phone calls to an answering service and respond to recorded questions. To participate in the BI program, offenders had to be in compliance with the terms of their probation or supervision. When an offender failed to call in as required, the BI program notified the DOC, and the DOC's computer system automatically generated a warning letter to the offender bearing the name and telephone number of his assigned agent. Hageman was in the program to insure that he paid court-

ordered restitution. On February 22, 2001, Hageman stopped making restitution payments.

In October 2001, Salas transferred to the Madison office of the Division of Community Corrections and assumed responsibility for a caseload that included approximately 350 BI program offenders, including Hageman. On June 30, 2002, the DOC's contract with BI Corporation expired, and the program ended. The DOC sent letters to the program's participants directing them to report to their agents. Around that time, the DOC's Madison office divided local BI program participants among the agents in Salas' unit, with each agent receiving about ten cases. Salas began entering the new cases into his computer and tried to obtain some information from the BI program's electronic filing system. His efforts to obtain the information were unsuccessful because the electronic files had been destroyed when the contract expired. On October 28, 2002, someone completed a DOC-506 form (a form used to reassess the risks associated with an offender), reclassifying Hageman to medium-risk.[1]

Salas and other agents kept apprised of their caseload using a computer program known as the Offender Activity Tracking System ("OATS"). The program included a "reminders list" that tracked reports and forms that either were overdue or needed to be completed within the next forty-five days, including DOC-506 forms. The OATS program never prompted Salas to complete or submit any forms related to Hageman, nor was he alerted to any

---

[1] Salas cannot recall completing the form, and he emphasizes that numerous persons had access to the system from which it was created. However, at various stages of the DOC's disciplinary investigation, Salas conceded that if Hageman was in his caseload and a DOC-506 was completed, Salas would have been the person who completed it.

incomplete work on Hageman's case when he met with a supervisor in April 2003 to review his caseload.

In September 2003, Hageman's father called Wesley Ray, Salas' supervisor, and told him that Hageman was in the hospital suffering from a serious medical problem. On September 23, 2003, Ray questioned Salas about Hageman, and Salas told Ray that he had no knowledge of Hageman.[2] As a result, the DOC assigned Hageman's file to a new agent and began investigating whether Salas had failed to supervise the offender. Defendant Denise Symdon coordinated the investigation, and she assigned Leann Moberly, another defendant, to interview Salas. On November 17, 2003, Moberly interviewed Salas, who was accompanied by a union representative. Salas acknowledged that he had neither met with Hageman nor issued an apprehension report for him. However, Salas said that he could not have known that he was required to take action with respect to Hageman because OATS never displayed any notices about the offender. Based on the interview, Moberly recommended Salas' termination.

On December 4, 2003, Marie Finley, the Assistant Regional Chief of the DOC, conducted a pre-disciplinary meeting with Salas.[3] She concluded that Salas was responsible for supervising Hageman from Fall 2001 through September 23, 2003 and that Salas had not completed required offender report forms or chronological log entries

---

[2] Salas said that Hageman "fell through the cracks," and the parties dispute what Salas meant. Salas claims that the statement implied that the computer system lost track of Hageman, not that he had missed required meetings with Hageman as the defendants claim.

[3] Finley was originally a defendant in this case, but the district court dismissed her because it lacked personal jurisdiction.

during that time period.[4] Finley also questioned Salas about the DOC-506 form in Hageman's file that reclassified him from minimum to medium risk.

On February 3, 2004, Symdon met with Salas to review Hageman's file. She asked Salas to show her what file information he had used to complete the DOC-506 reclassification form. Salas asked to see the form, but Symdon told him that the form was unavailable. Because she believed that Salas had no way of knowing the information contained in the DOC-506 form, she concluded that Salas had used false information to complete it. Symdon also concluded that Salas should have issued an apprehension request for Hageman. Accordingly, Symdon recommended Salas' termination. Other DOC officials approved the recommendation, including the Human Resources Coordinator, the Division Administrator, the Office of Diversity, and the Department Deputy Secretary.

On March 19, 2004, the DOC terminated Salas for alleged violations of Work Rules 2, 4, and 6. Rule 2 requires employees to follow departmental policies and procedures, and Rule 4 prohibits negligence in the performance of assigned duties. Rule 6 prohibits falsifying records or providing false information.

No department employee other than Salas has ever been terminated for falsifying a DOC-506 form. Indeed, numerous employees charged with similar or more egregious

---

[4] Salas disputes the time period that he was responsible for Hageman, but the parties agree that he was responsible for the offender during most of the relevant time period. Additionally, Salas disagrees with Finley's conclusion that he failed to complete required tasks, stating that any of his log entries or other notes related to BI program offenders were entered into the electronic BI files, which were destroyed when the BI contract expired.

offenses received lesser punishments than Salas. The following table documents the punishments of several other DOC employees who committed similar infractions:

| DATE | AGENT | RULES VIO-LATED | SUMMARY OF ALLEGATIONS | DISCIPLINE |
|---|---|---|---|---|
| July 9, 2001 | William Sorenson | 1,4 | failed to complete assigned tasks or contact offender who killed someone while under the agent's supervision | 30-day suspension |
| February 25, 2003 | Stephen Larson | 2,4 | failed to take offender into custody after allegations were made regarding offenders' involvement in violent behavior; offender subsequently killed his girlfriend, their daughter, and himself | 20-day suspension |
| September 5, 2003 | James Schachtschneider | 1,2,4, 6 | failed to issue two apprehension requests after being directed to do so; lied to supervisor about it; had previously been suspended for 3-days after violating rules 2,4, and 6 | 5-day suspension |

| September 22, 2003 | Patti Dunn-Jones | 2,4,6 | lied to supervisor and took no action after learning that an offender was residing with a 16-year-old girl; had prior 3-day suspension for violating rules 1,2,4, and 6 and 5-day suspension for violating rules 2, 4, and 6 | 10-day suspension |
|---|---|---|---|---|
| November 4, 2003 | Joe Chiarello | 1,2,4, 6 | failed to supervise four offenders and lied to supervisor | 15-day suspension |

## B. Darren Rogers' EEOC Charge

In July 2003, approximately eight months before Salas was terminated, a corrections agent named Darren Rogers, an African-American, filed a charge of discrimination with the EEOC alleging that the DOC discriminated against him because of his race. The charge noted, "Agent Francisco Salas—Hispanic Male—Treated the same as me and has also endured some of the same discriminatory behaviors by management, supervisors, and coworkers." Before Rogers filed his charge, Salas agreed to testify on his behalf, and Rogers considered Salas his most important witness. Although Salas claims that the EEOC notified the DOC of Rogers' charge on December 4, 2003, the notice of charge is not in the record. On March 11, 2004, an EEOC investigator contacted the DOC's Office of Legal Counsel, advising it that the EEOC planned to interview several employees, including Salas.

The next day, a paralegal in the Office of Legal Counsel sent an e-mail message to several department employees, including defendants William Grosshans and Symdon, that

named the intended interviewees and identified the interview site and date. Salas complained to the Office of Legal Counsel that the interview site was not neutral and requested that an alternate site be chosen. He also complained that the interview notice was sent out in a general e-mail, stating, "You have just isolated an individual and made everyone aware of what is going on in a personnel matter which should have been treated and handle[d] as a private matter." However, the Office of Legal Counsel did not forward Salas' complaint to any of the individual defendants. Subsequently, the EEOC investigator decided to have the interviewees individually schedule their interviews. In affidavits, Symdon, Grosshans, and Moberly all testified that, prior to March 12, 2004, they had no personal knowledge of Salas' involvement with the EEOC investigation. Salas, on the other hand, claims that before his termination, the complaint was being sent around as office gossip.

### C.  Salas' EEOC Charge and District Court Proceedings

On November 30, 2004, Salas filed his own EEOC charge, alleging retaliation and race, age, and color based discrimination. The EEOC received the charge on December 2, 2004 and assigned it Charge No. 260-2005-01740. On January 7, 2005, an EEOC investigator informed Salas that his status as a Hispanic did not support a charge of race discrimination and that his charge would have to be amended to allege national origin discrimination. Salas amended his charge accordingly and filed the amended charge on January 19, 2005. Salas then filed suit in the district court, alleging violations of Title VII, the First Amendment, the Due Process Clause, and the Equal Protection Clause.

During discovery, in response to a request to admit, Salas confirmed that the EEOC charge he signed on

January 19, 2005 "was the only charge of discrimination that he or anyone else ever filed with the EEOC regarding the termination of his employment with the DOC." Curiously, Salas denied a similar request to admit, which stated, "No Charge of Discrimination was filed with either the Equal Employment Opportunities Commission or the Wisconsin Equal Rights Division before January 19, 2005, by you or anyone else, regarding the termination of your employment with the Wisconsin Department of Corrections." Salas explained to the district court that he thought the November 30, 2004 and January 19, 2005 charges constituted one charge because they bore the same charge number.

Based on Salas' admission, the defendants argued that Salas failed to exhaust his Title VII claims because he was required to file an EEOC charge within 300 days of his termination, i.e., on or before January 12, 2005. Salas responded that he filed a charge with the same charge number in November. Although he did not provide the district court with the earlier filing, he produced a receipt showing that the EEOC received a mailing from him on December 2, 2004. The district court emphasized that it was Salas' burden to establish the timeliness of his filing and concluded that he had not met his burden because he had not produced the earlier filing and the court had no way of knowing what he mailed to the EEOC. The district court then granted summary judgment in favor of the DOC on all claims. Salas appeals.

## II. DISCUSSION

This Court reviews a district court's entry of summary judgment de novo. *Davis v. Con-Way Transp. Cent. Express, Inc.*, 368 F.3d 776, 782 (7th Cir. 2004). Summary judgment is inappropriate if the plaintiff points to genuine issues of material fact. *See McCoy v. Harrison,* 341 F.3d 600, 604 (7th Cir. 2003). To survive summary judgment,

the nonmoving party must make a sufficient showing of evidence for each essential element of its case on which it bears the burden at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986).

## A.  Timeliness of the EEOC Complaint

Salas argues that the district court erred by concluding that his EEOC charge was not timely. Title VII provides that a charge of discriminatory employment practices shall be filed with the EEOC within 300 days "after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1). Failure to file a timely charge with the EEOC precludes a subsequent lawsuit under Title VII. *Beamon v. Marshall & Ilsley Trust Co.*, 411 F.3d 854, 860 (7th Cir. 2005). Filing a timely charge with the EEOC is not a jurisdictional prerequisite to suit in federal court; rather, it is an affirmative defense akin to administrative exhaustion. *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982).

The district court considered the following evidence regarding the timing of Salas' EEOC charge: 1) Salas' seemingly inconsistent admissions, one of which affirmed that the January 19, 2005 charge was the only charge he had filed, 2) a registered mail return receipt showing that Salas had mailed *something* to the EEOC on December 2, 2004, 3) a January 7, 2005 form letter from the EEOC acknowledging Salas' contact with the office regarding alleged employment discrimination, and 4) Salas' testimony that the January 19, 2005 charge was an amended version of an earlier, timely filing, which charged discrimination based on race as well as retaliation.

Because the DOC denied receiving a charge other than the untimely one, the district court reasoned that there were two plausible explanations based on the evidence: either the EEOC inadvertently neglected to deliver the

original charge or the December 2004 mailing did not meet the standards for EEOC charges articulated in 29 C.F.R. § 1601.12(6).[5] The district court recognized that the evidence "raise[d] questions regarding whether [Salas'] December mailing to the EEOC contained a 'written statement sufficiently precise to identify the parties, and to describe generally the action or practice [of which plaintiff] complained.'" However, the court granted summary judgment in favor of the DOC, stating that Salas bore the burden of proving a timely filing, and he should have produced a copy of the document he mailed to the EEOC in December.

We cannot accept the district court's finding on this issue, however, because it was premised on an error of law. A plaintiff's failure to exhaust administrative remedies is an affirmative defense, which is the defendant's burden to prove. *See Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006); *Massey v. Helman*, 196 F.3d 727, 735 (7th Cir. 1999). Because we agree with the district court's assessment that the evidence was inconclusive at best, the tie must go to the plaintiff. Consequently, we conclude that Salas' EEOC charge was timely.

## B. Salas' Title VII Claims

Because the timeliness issue is not dispositive of the Title VII claims, we must determine whether Salas has offered evidence sufficient to establish a prima facie case of either national origin discrimination or retaliation.

---

[5] The district court, understandably, did not consider a third possibility, which turned out to be exactly what happened: the DOC had received the earlier charge despite telling the court that it had not.

1. National Origin Discrimination

To make a prima facie case of disparate treatment based on national origin, a plaintiff must prove that 1) he was a member of a protected class, 2) he was meeting his employer's legitimate business expectations, 3) he suffered an adverse employment action, and 4) his employer treated similarly situated employees outside of the class more favorably. *Ballance v. City of Springfield,* 424 F.3d 614, 617 (7th Cir. 2005). Once a plaintiff has established a prima facie case, the burden of production shifts to the defendant to provide a legitimate, nondiscriminatory reason for the decision. *Id.* If the defendant satisfies its burden, then the burden shifts back to the plaintiff to show that the defendant's explanation was pretextual. *Id.*

Salas claims that he offered evidence from which a jury reasonably could find a prima facie case of discrimination. He alleges that 1) he is Hispanic, 2) he was not disciplined during the first seventeen years of his career and was promoted regularly, 3) he was terminated from his position, and 4) similarly situated non-Hispanic employees were not terminated for similar or more severe disciplinary infractions.

The DOC contests the first and fourth prongs of the prima facie case, and it asserts that Salas' rule violations constituted a legitimate, non-discriminatory basis for his termination. As to the first prong, the DOC maintains that Salas' allegation that he is Hispanic is insufficient to support a claim of national origin discrimination. In *Espinoza v. Farah Manufacturing Co.*, the Supreme Court recognized that national origin "refers to the country where a person was born, or, more broadly, the country from which his or her ancestors came." 414 U.S. 86, 88 (1973) (concluding that "national origin" does not refer to citizenship). The DOC correctly notes that Salas did not identify the "Hispanic" nation from which he hailed. It analogizes this case to *Lapine v. Edward Marshall Boehm,*

*Inc.*, No. 89 C 8420, 1990 WL 43572, at \*5 (N.D. Ill. Mar. 28, 1990), in which a district court dismissed a plaintiff's national origin claim because being Jewish did not indicate national origin. The district court stated that "Jews, like Catholics and Protestants, hail from a variety of different countries." *Id.*

In the federal courts, there is uncertainty about what constitutes race versus national origin discrimination under Title VII. *See Torres v. City of Chicago*, No. 99 C 6622, 2000 WL 549588, at \*2 (N.D. Ill. May 1, 2000) (recognizing that common use of the term Hispanic "has blurred the line between race and national origin discrimination"); *Ortiz v. Bank of Am.*, 547 F. Supp. 550, 560-62 (E.D. Cal. 1982) (recognizing that the line between racial and national origin discrimination is difficult to draw and adding that "the notion of 'race' as contrasted with national origin is highly dubious").

The EEOC defines national origin discrimination broadly to include the denial of employment opportunities because of an individual's, or his or her ancestor's, place of origin *or because an individual has the physical, cultural, or linguistic characteristics of a national origin group*. 29 C.F.R. § 1606.1 (emphasis supplied). Although the EEOC does not define the term "national origin group," Hispanics would qualify as such a group. Indeed, an employer that discriminates against Hispanics may do so because of their appearance or accent, the very characteristics described in the EEOC regulations. Moreover, Salas' charge of discrimination did not deprive the DOC of notice or otherwise hamper its ability to defend the claim. We therefore conclude that a plaintiff alleging that he is Hispanic sufficiently identifies his national origin to survive summary judgment.

Next, we must determine whether Salas has identified similarly situated, non-Hispanic employees who were treated more favorably. A similarly situated employee is

one who is "directly comparable to the plaintiff in all material aspects." *Patterson v. Avery Denison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002). Factors to consider include whether the employees 1) had the same job description, 2) were subject to the same standards, 3) were subject to the same supervisor, and 4) had comparable experience, education, and other qualifications. *Bio v. Fed. Express Corp.*, 424 F.3d 593, 597 (7th Cir. 2005). Using DOC disciplinary records, Salas has identified several employees who held the same position, were subject to the same standards, and violated the same rules without being terminated. Indeed, he has identified several probation officers whose behavior arguably was more egregious, as well as several with prior disciplinary problems, who were treated far better than he was. However, this Court's role is not simply to assess whether an employee was treated unfairly; we must determine whether he may have been treated unfairly because he is Hispanic.

Salas contends that his national origin motivated the DOC's decision to terminate him, but he offers no evidence of the race or national origin of the better-treated employees he identifies for comparison. Although Salas was the only Hispanic male in the Madison office, that fact does not help him—the DOC's disciplinary records come from offices across the state, and they do not differentiate between offices. Rather than making an argument about the likelihood that the similarly situated employees are not members of the protected class, Salas ignores the requirement altogether. *See Witte v. Wis. Dep't of Corrs.*, 434 F.3d 1031, 1038 (7th Cir. 2006) (recognizing that a party forfeits any argument it fails to raise in a brief opposing summary judgment). Accordingly, he cannot establish a prima facie case of national origin discrim-

ination.[6]

## 2. Retaliation

Next, we must consider whether Salas' evidence precludes summary judgment on his retaliation claim. Under Title VII's anti-retaliation provision, it is unlawful for an employer to "discriminate against" an employee "because he has opposed any practice made an unlawful employment practice" by the statute or "because he has made a charge, testified, assisted, or participated in" a Title VII "investigation, proceeding, or hearing." 42 U.S.C. § 2000e-3(a). A plaintiff may prove retaliation by presenting direct evidence of 1) a statutorily protected activity, 2) an adverse action taken by the employer, and 3) a causal connection between the two. *Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 728 (7th Cir. 2003). Under the direct method, this Court has accepted circumstantial evidence of intentional retaliation, including evidence of suspicious timing, ambiguous statements, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn. *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994). An indirect retaliation claim mirrors an indirect disparate treatment claim, except that the first prong requires evidence of

---

[6] Had Salas established the prima facie case, the record is replete with evidence that other officers received less severe punishments for similar (and worse) behavior. A jury might well conclude from this evidence that the DOC's asserted reasons for terminating Salas were pretextual. *See, e.g.*, *Stalter v. Walmart Stores, Inc.*, 195 F.3d 285, 289 (7th Cir. 1999) (recognizing that pretext can be established by showing that employer's asserted reasons were insufficient to motivate the adverse employment action).

protected activity under Title VII rather than proof of membership in a protected group. *See, e.g.*, *Roney v. Ill. Dep't of Transp.*, 474 F.3d 455, 459 (7th Cir. 2007).

Although Salas argued that the DOC retaliated against him in violation of Title VII, he does not outline how he would establish his claim under either the direct or indirect method. *See Hojnacki v. Klein-Acosta*, 285 F.3d 544, 549 (7th Cir. 2002) (recognizing that a party waives any argument it fails to develop on appeal). Even if Salas did not waive his retaliation claim, his direct method claim fails because he lacks evidence of causation. Salas has not produced evidence from which a jury could conclude that the DOC had actual knowledge, prior to terminating Salas, of his participation in an EEOC investigation. *See Tomanovich v. City of Indianapolis*, 457 F.3d 656, 668 (7th Cir. 2006) (recognizing that it is not sufficient to show that an employer could or should have known about an employee's complaint). Specifically, he has offered no evidence, aside from bare assertions, that the DOC received Rogers' charge of discrimination prior to recommending Salas' termination.[7] Finally, as discussed above, Salas' indirect method retaliation claim fails because he has not identified any similarly situated, non-Hispanic employees who were treated more favorably.

## C.  §1983 First Amendment Retaliation Claim

To survive summary judgment on his First Amendment retaliation claim, Salas must produce evidence from which a jury could conclude that he engaged in constitutionally protected speech and that the speech was a substantial or

---

[7] The record contains only a single, undated paragraph from Rogers' EEOC narrative, which Salas attached to his affidavit as Exhibit EE.

motivating factor in his termination. *See Bd. of County Comm'rs, Wabaunsee County, Kan. v. Umbehr*, 518 U.S. 668, 675 (1996). Salas claims that the defendants terminated him in retaliation for two instances of protected speech: his testimony on behalf of Rogers and his complaint to the Office of Legal Counsel about the manner in which the DOC was handling the investigation of Roger's complaint.

We have recognized that participating in a lawsuit may amount to protected speech, although a "public employee has no First Amendment claim unless the lawsuit involves a matter of public concern." *Zorzi v. County of Putnam*, 30 F.3d 885, 896 (7th Cir. 1994); *Yatvin v. Madison Metro. Sch. Dist.*, 840 F.2d 412, 419-20 (7th Cir. 1988) (holding that plaintiff's retaliation lawsuit was not protected by the First Amendment where it addressed only a personal grievance). In this case, Salas' participation as a witness to Rogers' EEOC charge was not an internal workplace grievance meant to advance his own career. He sought to expose widespread discrimination against minorities within the DOC, which is a matter of public concern. *See, e.g.*, *Catletti v. Rampe*, 334 F.3d 225, 230 (2d Cir. 2003) (holding that a worker's testimony on behalf of a wrongly discharged co-worker is protected speech).[8]

---

[8] Interestingly, the parties do not address the fact that Salas had not yet testified in the EEOC investigation when he was terminated, nor do they delineate what communications, if any, Salas had with Rogers or the EEOC investigator before he was fired. The parties also neglect to address the effect of *Garcetti v. Ceballos*, 126 S. Ct. 1951 (2006), which significantly limits First Amendment protection of public employees' speech. Nevertheless, for purposes of this appeal, we assume that Salas' involvement in the EEOC investigation was protected speech.

Though Salas may have engaged in protected speech, he offered insufficient evidence to prove a causal connection between his speech and termination. Salas argues that the timing of his termination was suspicious because it occurred just two weeks before he was scheduled to testify in Rogers' case. *See Adusumilli v. City of Chicago*, 164 F.3d 353, 363 (7th Cir. 1998) (a plaintiff may establish a causal link between protected expression and an adverse action through evidence that the discharge took place on the heels of protected activity). The timing of Salas' termination was only suspicious, however, if the relevant decision-makers knew about his involvement in the EEOC investigation. *Tomanovich*, 457 F.3d at 668. The district court concluded that there was no evidence that the individual defendants were aware that Salas planned to speak with the EEOC about Roger's complaint, and we agree. Although Salas contends that the notice of charge received by the DOC mentioned him, he offers no evidence that the individual defendants had access to the charge.[9]

Salas also relies on a March 20, 2004 e-mail in which Rogers complained to an EEOC investigator that his complaint "[wa]s being sent out and distributed throughout Department of Corrections like a 'Breaking News Story.'" A jury could not conclude from this e-mail that the

---

[9] Salas' affidavit states that the individual defendants were aware of his involvement in the EEOC investigation, but it relies on a March 12, 2004 e-mail in which the DOC's Office of Legal Counsel notified two of the defendants that Salas was one of several persons that the EEOC intended to interview. Although that e-mail gave Symdon and Grosshans actual notice that Salas was involved in the investigation, the DOC had already decided to terminate Salas by the time the e-mail was circulated. Consequently, the e-mail cannot be used to show that Salas' participation in the investigation influenced the decision to terminate him.

relevant decision makers knew of Salas' involvement in the investigation. Aside from obvious hearsay problems that could render the e-mail inadmissible, it does not state that the individual defendants knew about Salas' involvement before they recommended terminating him.

Likewise, Salas has offered no evidence from which a jury could conclude that his complaint about the handling of the Rogers investigation motivated the termination. Salas complained just days before the termination became effective, and, by that point, the individual defendants had already decided to fire him. Moreover, the Office of Legal Counsel did not circulate Salas' e-mail, and he has offered no evidence that the defendants had any knowledge of it. Accordingly, Salas cannot prevail on his First Amendment claim.

### D.  §1983 Equal Protection Claim

An employee may prove a prima facie equal protection violation using the same indirect, burden shifting method used for Title VII claims. *See Williams v. Seniff*, 342 F.3d 774, 788 (7th Cir. 2003). The only difference is that a Title VII claim is against an employer, while an equal protection claim is against individual employees. *See Hildebrandt v. Ill. Dep't of Natural Res.*, 347 F.3d 1014, 1036 (7th Cir. 2003). Although some cases from this Court have suggested that a fifth, freestanding element—proof of discriminatory intent—is necessary to establish a prima facie equal protection violation, *see, e.g.*, *McPhaul v. Board of Commissioners of Madison County*, 226 F.3d 558, 564 (7th Cir. 2000), we have clarified that those cases "are best read as simply emphasizing the requirement that § 1983, like disparate treatment cases under Title VII, require ultimately proof of discriminatory intent." *Williams*, 342 F.3d at 788 n.13.

In this case, the district court granted summary judgment to the DOC based, in part, on its conclusion that Salas had offered no evidence of discriminatory intent.[10] By requiring Salas to prove this fifth element of a prima facie case, the district court effectively transformed the indirect method, thus heightening Salas' burden of proof. Despite the district court's error, summary judgment for the defendants was appropriate. Again, Salas has failed to offer evidence that the similarly situated individuals he identified were non-Hispanic. *See Johnson v. Gudmundsson*, 35 F.3d 1104, 1115 (7th Cir. 1994) (recognizing that summary judgment may be affirmed on any ground supported by the record).

### E. Procedural Due Process Claim

To prove a violation of his procedural due process rights, Salas must show that the State deprived him of a protected liberty or property interest and that the deprivation occurred without adequate due process. *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 569 (1972). Whether Salas has a property interest in continued employment is governed by Wisconsin law. *See Roth*, 408 U.S. at 577. Here, the parties agree that Salas' union contract, which stated that he could only be fired for just cause, created a property interest in his continued employment that was protected by the Due Process Clause. *See, e.g., Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 538-41 (1985); *Arneson v. Jezwinski*, 592 N.W.2d 606, 616 (Wis. 1999). As a Wisconsin state employee, Salas was entitled to the full panoply of due process rights, including adequate

---

[10] Although Salas offered a union report documenting discrimination against minorities within the DOC, the district court correctly ruled that the evidence was inadmissible due to hearsay and foundation problems.

notice of the reasons for the discharge, an impartial decision maker, and the opportunity to confront and cross-examine adverse witnesses. *Milwaukee Dist. Council 48 v. Milwaukee County*, 627 N.W.2d 866, 878 (Wis. 2001). However, where adequate post-deprivation procedures are available, an individual with a property interest in his continued employment is entitled only to minimal predeprivation process: "oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Loudermill,* 470 U.S. at 546.

Salas argues that Symdon violated his due process rights by refusing to give him access to the DOC-506 form that he allegedly falsified.[11] He claims that his inability to view the document deprived him of adequate notice of the charges against him and impeded his ability to explain his side of the story. Furthermore, he claims that the DOC never told him what information he supposedly falsified.

Salas relies on this Court's decision in *Swank v. Smart*, 898 F.2d 1247, 1254-55 (7th Cir. 1990), to support his claim. The plaintiff in *Swank* was a police officer who was terminated from his employment for behavior unbecoming an officer. *Id.* at 1249-1250. During a disciplinary hearing, the chief of police provided the decision makers with a written statement evaluating the effect of the plaintiff's conduct on the police department and on the town, but the plaintiff was not allowed to view or challenge the statement. *Id.* at 1253. We characterized the written

---

[11] We note that although Salas characterizes Symdon's actions as an outright refusal to show him the DOC-506 form, he admitted in response to Interrogatory No. 11 that Symdon actually told him the form was unavailable because it was in Finley's locked desk.

statement as relevant and highly material evidence and concluded that the ex parte presentation of that evidence raised serious questions about the adequacy of the hearing. *Id.*

Salas contends that his case is analogous to *Swank* because the DOC-506 form was material to the DOC's decision to terminate him, and he was not allowed to view it. Although the record supports Salas' contention that the alleged falsification was a key factor in the department's decision to terminate him, undisputed record evidence demonstrates that this case is distinguishable from *Swank*. Most importantly, Salas' alleged lack of access to the form did not prevent him from explaining his side of the story. He maintained that he did not falsify the form because he could have completed it using information in Hageman's file. He did not need the form to make this argument. Moreover, the transcript from Salas' arbitration hearing demonstrates that he was given access to the form at some point during the DOC's disciplinary proceedings. Indeed, Salas went over the form (which was marked as Joint Exhibit 21 during the arbitration) during the hearing, explaining in detail how he would have filled it out using information from Hageman's file. *See Schacht v. Wis. Dep't of Corrs.*, 175 F.3d 497, 503 (7th Cir. 1999) (recognizing that where post-termination administrative remedies are available, a pre-termination hearing can be limited to determining the existence of reasonable grounds for discharge). Accordingly, Salas' claim that the denial of access to the DOC-506 form during a pre-termination interview violated procedural due process cannot succeed.

Salas also contends that his due process rights were violated because the proceedings in which he participated, although nominally adequate, were shams. *See Ryan v. Ill. Dept. of Children & Family Servs.,* 185 F.3d 751, 762 (7th Cir. 1999). Although Salas has identified erroneous

factual findings in his hearings, such errors, by themselves, do not show that the hearings were shams. *See, e.g., Pugel v. Bd. of Trs. of the Univ. of Ill.*, 378 F.3d 659, 666 (7th Cir. 2004) (holding that a hearing is not sham just because the plaintiff identifies errors and disagrees with the result). Salas was given a chance to explain his side of the story with a union representative present, the DOC's decision went through multiple levels of review, and Salas has offered no evidence from which a jury reasonably could conclude that the DOC defendants had made up their minds before the hearings occurred. In short, Salas cannot prove that the procedures the DOC afforded him were shams.

### III. Conclusion

For the foregoing reasons, we Affirm the district court's entry of summary judgment.

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*