In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-1489

NOAH DIETCHWEILER, by Michael
Dietchweiler, his father and next
friend, and ANN DIETCHWEILER,

*Plaintiffs-Appellants*,

*v.*

STEVE LUCAS, in his official and indi-
vidual capacities, et al.,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Central District of Illinois.
No. 13 CV 2062 — **Harold A. Baker**, *Judge.*

ARGUED NOVEMBER 9, 2015 — DECIDED JUNE 28, 2016

Before WOOD, *Chief Judge*, ROVNER, *Circuit Judge*, and SHAH,
*District Judge.*[*]

[*]   Hon. Manish S. Shah, of the Northern District of Illinois, sitting by
designation.

PER CURIAM.  After he was temporarily suspended from Watseka Community High School for allegedly consuming or possessing drugs, Noah Dietchweiler through his parents Michael[1] and Ann Dietchweiler sued Iroquois County Community Unit School District 9, school administrators Steve Lucas, James Bunting, and Kenneth Lee as well as the entire school board. The Dietchweilers' suit under 42 U.S.C. § 1983 alleged primarily that the defendants violated Noah's due process rights under the Fourteenth Amendment. They also advanced state law claims for intentional infliction of emotional distress, slander, and violations of the Illinois School Code, 105 ILCS 5/10-22.6, which provides procedures for suspending and expelling students. The district court granted the defendants' motion for summary judgment on the Dietchweilers' due process claim and dismissed the state law claims without prejudice. The Dietchweilers appeal, and we affirm.

I.

On January 25, 2013, Noah Dietchweiler was one of several students suspended from Watseka High School in Iroquois County, Illinois, based on an allegation that another student, M. M., was distributing prescription drugs at school. Shortly after lunch that day, a student came to Steve Lucas, the dean of students, to report that M.M. had been giving pills to another student in the cafeteria. Mr. Lucas immediately told the

---

[1]  The defendants represent that upon information and belief Michael Dietchweiler died during the pendency of this appeal. Michael's death has no substantive impact on the case because Noah's claim continues through his mother Ann; references to Michael throughout the opinion reflect the understanding that he was alive throughout the course of the proceedings described.

principal, James Bunting, what he had heard. The two of them began their investigation of the allegation by interviewing M.M. in the office.

When Mr. Bunting and Mr. Lucas questioned M.M., he eventually admitted he had been distributing pills to fellow students. A search of M.M. revealed two prescription Ativan pills hidden in his sock. Ativan is the brand name for Lorazepam, an anti-anxiety drug belonging to the class of drugs known as benzodiazepines, which affect the central nervous system. *See* U.S. Nat'l Library of Med., PubMed Health, *Lorazepam*, (Mar. 1, 2016), http://ncbi.nlm.nih.gov/pubmedhealth/PMHT0001078 (last visited May 26, 2016). M.M. also had with him a piece of paper listing the names of four other Watseka students with dollar amounts (ranging from $4 to $10) listed to the side of their names; Noah's name appeared on the list with $10 written next to it. M.M. explained that the listed students were individuals to whom he had sold Ativan pills. He also provided a written statement admitting that he had "given the pills to" seven Watseka students, one of whom was Noah. At that point, M.M.'s grandmother (his legal guardian) was called to the school. M.M. was given a written suspension notice and went home with his grandmother.

Mr. Lucas and Mr. Bunting then proceeded to interview all seven students who were identified in M.M.'s written statement. According to Noah, whose version of the events we credit at this stage of the proceedings, Mr. Lucas then came into his classroom and motioned for Noah to accompany him to the office. Mr. Lucas instructed Noah to sit down outside of Mr. Bunting's office and not to leave or speak to anyone while

he waited. After approximately thirty minutes, Mr. Bunting came and took Noah across the hall to Mr. Lucas's office. Mr. Lucas said to Noah something along the lines of, "I think you know why you are here." Noah denied having any idea of what was going on. Mr. Lucas then asked Noah whether he knew there were drugs being sold at Watseka. When Noah again denied knowing anything about it, Mr. Bunting told Noah he could choose between a ten-day suspension for admitting to taking the drugs or expulsion if he denied involvement. At that point Noah said simply, "Whatever."

The administrators then placed a suspension form on the desk in front of Noah and asked him to contact his parents. Noah's mother Ann, who by that time was waiting out in front of the school to pick Noah up, was then called. When she got to the office and Mr. Bunting explained why Noah was there, she requested that they call Noah's father, Michael Dietchweiler, who was an attorney. After putting Michael on speaker phone so that everyone present in the room (Mr. Bunting, Mr. Lucas, Ann, and Noah) could hear, Mr. Lucas and Mr. Bunting explained to Michael that Noah was being suspended for ten days for possession and use of illegal drugs. After the brief conversation on speaker phone concluded, Noah signed the suspension notice, shook hands with Mr. Lucas and Mr. Bunting, collected his things and left the school with his mother. The notice Noah signed listed the date and stated that Noah was being suspended for "possession of drugs" and below that "consumption of drugs." It informed Noah that he could return to school on Monday, February 11, and could make up any work missed while suspended. Noah signed, acknowledging that he had attended a "student suspension hearing" with Mr. Lucas and been afforded an

opportunity to present a defense to explain the circumstances of his actions "and/or prove innocence."

Later that evening at home, Noah denied any involvement in the situation with M.M. and the Ativan. Noah's father arranged for him to take a drug test that same night through a physician friend who met them at the local hospital. The results of the supervised drug test were negative for the presence of any drugs, including benzodiazepines. Noah's father e-mailed Mr. Bunting over the weekend with the drug test results and also went to the school Monday morning to present him with the results. Mr. Bunting was uninterested, and told Noah's father that he could follow the procedures for an appeal of the suspension if he wished.

Noah and his parents retained counsel and appealed his suspension. At a suspension review hearing, *see* 105 ILCS 5/10-22.6(b), on February 5, 2013, the school board voted unanimously to uphold Noah's suspension. At the hearing, Mr. Lucas and Mr. Bunting testified that when they interviewed Noah on January 25th, they told him that they had already spoken with other students and he needed to be honest with them to avoid more stringent punishment. According to both administrators, Noah then admitted that M.M. had given him pills the previous day (January 24th). Mr. Lucas and Mr. Bunting recounted that Noah believed the pills were medication for Attention Deficit Disorder and would help him focus or stay awake. According to their account, Noah also admitted that before the present incident, he had done some drugs but had quit after attending a Christian camp earlier that month.

Noah testified consistent with his later deposition testimony that after they had called him to the office, he denied knowing about drugs at school, and when faced with the choice of confessing or being expelled he said simply, "Whatever." Both of the Dietchweilers testified. Ann recounted arriving in the office and having Mr. Lucas or Mr. Bunting tell her that Noah had failed to report seeing another student with drugs at school, after which she asked to call Michael. He testified that during the conversation on speaker phone, Mr. Lucas and Mr. Bunting told him that Noah had taken drugs and was being suspended. The Dietchweilers also presented the negative results of Noah's drug test. Finally, the Dietchweilers explained that much of their defense had been prepared with an eye to the school's allegation that Noah took drugs on the day he was suspended, Friday, January 25th, and not the previous day as the administrators were claiming at the hearing. After deliberation in a closed executive session, the board concluded that Noah had violated school rules by *possessing*, not consuming, drugs at school and ratified his ten-day suspension.

Although Noah could have made up any schoolwork missed as a result of the suspension, he chose not to return to Watseka High School. Prior to the suspension he had been in the process of transferring to Culver Military Academy. After he was suspended, he completed his sophomore year through an online school and began at Culver Military Academy that fall. He repeated his sophomore year because Culver Military Academy did not credit the online schooling Noah did to complete his sophomore year.

Noah, through his parents Michael and Ann, sued the school district, Mr. Lucas and Mr. Bunting, the school superin-

tendent Kenneth Lee, and the Iroquois County District 9 school board members, Don Becker, Brenna Johnson, Crystal Blair, Bob Burd, Kirk McTaggert, and Dee Schippert. The district court granted summary judgment to the defendants on Noah's due process claim under § 1983 after concluding that under the Dietchweilers' version of events, Noah received the minimal due process safeguards constitutionally required for a school suspension of ten days or less. *See Goss v. Lopez*, 419 U.S. 565 (1975). The court declined to exercise supplemental jurisdiction over the Dietchweilers' remaining state law claims and dismissed them without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

## II.

We review the district court's grant of summary judgment *de novo*, *e.g.*, *Seiser v. City of Chi.*, 762 F.3d 647, 653 (7th Cir. 2014), resolving any disputed facts in favor of the nonmoving party and drawing all reasonable inferences from the facts in his favor, *e.g.*, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

Noah contends that he was deprived of due process at "every level" of his suspension—from the initial suspension by Mr. Lucas and Mr. Bunting through what he characterizes as the sham review hearing conducted by the school board. To demonstrate a violation of procedural due process rights guaranteed by the Fourteenth Amendment, a plaintiff must establish (1) a cognizable liberty or property interest; (2) the deprivation of that interest by some form of state action; and (3) the failure to employ constitutionally adequate procedures.

*See LaBella Winnetka, Inc. v. Village of Winnetka*, 628 F.3d 937, 943-44 (7th Cir. 2010). "Once it is determined that due process applies, the question remains what process is due." *Morrisey v. Brewer*, 408 U.S. 471, 481 (1972). Although students do have a protected property interest in public education provided by the state, the procedural safeguards required for a brief suspension are not extensive. *See Martin v. Shawano-Gresham Sch. Dist.*, 295 F.3d 701, 707 (7th Cir. 2002) ("[W]hile the U.S. Constitution requires a school which suspends a student to provide that student with due process, the process required is minimal."). The Supreme Court has explained that, "due process requires, in connection with a suspension of 10 days or less, that the student be given oral or written notice of the charges against him, and if he denies them, an explanation of the evidence the authorities have, and an opportunity to present his side of the story." *Goss*, 419 U.S. at 581. These requirements may be satisfied by an "informal give-and-take between student and disciplinarian, preferably prior to the suspension[.]" *Id.* at 584.

Under Noah's version of events, these minimal due process requirements were met. First, Mr. Lucas and Mr. Bunting explained to Noah the charges against him. Noah maintains that after he denied knowing why he was there in the office, Mr. Lucas told him that students had provided them with reason to believe Noah was involved with drugs at the school. Noah was then given the printed form informing him that he was being suspended for "possession of drugs[,] consumption of drugs." When Noah's mother arrived, she was told Noah had witnessed drug activity and failed to report it, and when Noah's father Michael was on the phone with Mr. Lucas and Mr. Bunting, they told him that Noah was being suspended for

possession and use of illegal drugs. At that point, neither Noah nor his parents asked what evidence there was of such behavior, nor did any of them seek to discuss the issue further with Mr. Lucas or Mr. Bunting. Despite Noah's assertion that he was "just shocked," there is nothing in the record to indicate he was not afforded an opportunity to tell the administrators his side of the story. By his own account, after his initial denial as to details of any drug use at school, he was overwhelmed and so he "just sat back in [his] chair" and said, "Whatever." He confirmed at his deposition that "whatever" was the "exact and only" word he used. After both of his parents had an opportunity to hear the charges against him, Noah signed the written suspension notice.

Whatever reservations we may have about the Watseka High School administrators' handling of the situation, we conclude that they did afford Noah the requisite notice and opportunity to be heard before suspending him. *See Pugel v. Bd. of Tr. of Univ. of Ill.*, 378 F.3d 659, 662-63 (7th Cir. 2004) ("The hallmarks of procedural due process are notice and an opportunity to be heard."); *see also Grannis v. Ordean*, 234 U.S. 385, 394 (1914) ("The fundamental requisite of due process of law is the opportunity to be heard."). The administrators orally notified Noah that students had implicated him in drugs at school. They also restated these charges in the presence of Noah's parents. Although according to Noah and his mother they initially accused him of failing to report drug activity and then elevated the accusations to taking drugs when Noah's father was on the phone, the fact remains that Noah had oral *and* written notice that he was being accused of possessing or ingesting drugs at school.

We are most troubled by the idea that the defendants threatened him with the specter of expulsion if he failed to admit the charges against him. But our task at summary judgment is simply to assess whether Noah received constitutionally adequate procedures prior to his ten-day suspension. This case would be much more straightforward if Mr. Lucas and Mr. Bunting had more fully explained to Noah what M.M. had said or informed him in some manner of the list retrieved from M.M.'s pocket or M.M.'s confession implicating Noah. If Noah had seen the evidence against him, we would feel much more comfortable concluding that he received a fair opportunity to present his side of the story to administrators.

As things stand, however, we conclude that the minimal requirements of *Goss* were satisfied: administrators explained to both Noah and his parents the general nature of the charges against him and provided him with a written suspension notice which Noah signed to acknowledge that he had been given an opportunity to provide his version of events. We note, however, the admonishment in *Goss* itself that if anything, the required procedures are "less than a fair-minded school principal would impose upon himself in order to avoid unfair suspensions." *Goss*, 410 U.S. at 583. Indeed, although the defendants' procedure as Noah describes it was enough to pass constitutional muster, it is at the outer limit of what process is constitutionally acceptable. That said, our review of Noah's due process claim must also take into account the additional layer of process he received at the full suspension review hearing shortly after his suspension—where he was represented by counsel and both he and his parents were afforded an opportunity to testify. *See Schacht v. Wis. Dep't of Corrs.*,

175 F.3d 497, 503 (7th Cir. 1999) (observing that when post-termination administrative remedies are available, a pre-termination hearing may be limited to establishing reasonable grounds for discharge); *see also Salas v. Wis. Dep't of Corr.*, 493 F.3d 913, 927 (7th Cir. 2007) (denial of access to particular form during pre-termination hearing unproblematic when plaintiff was allowed access to the form at some point and able to present his argument about the form during post-deprivation hearing). Thus, Noah would be unable to show that he was prejudiced by any deficiencies in the pre-suspension procedures. *See Piggie v. Cotton*, 342 F.3d 660, 666 (7th Cir. 2003) (per curiam).

Although Noah also attacks the review hearing itself as constitutionally deficient, we disagree. The majority of his complaints about the hearing relate to the defendants' alleged failure to follow their own published policies and procedures. But as we have repeatedly explained, a failure to follow state statutes or state-mandated procedures does not amount to a federal due process claim of constitutional magnitude. *See, e.g.*, *Charleston v. Bd. of Tr. of Univ. of Ill.*, 741 F.3d 769, 773 (7th Cir. 2013) ("[W]e will be clear once more: a plaintiff does not have a federal constitutional right to state-mandated process."); *Martin*, 295 F.3d at 706-07 ("[T]he failure to conform with the procedural requirements guaranteed by state law does not by itself constitute a violation of federal due process."); *Pro-Eco, Inc. v. Bd. of Comm'rs of Jay County, Ind.*, 57 F.3d 505, 514 (7th Cir. 1995) (violation of state law is not a denial of due process of law).

In addition to the various alleged procedural shortcomings, Noah maintains that the defendants denied him due process by

changing the focus of the charges at the review hearing from January 25th to January 24th. Given our conclusion that the defendant's pre-deprivation process satisfied the minimal requirements applicable to suspensions of ten days or less under *Goss*, it is not clear that *any* additional post-deprivation procedure was constitutionally required. But we need not decide the issue because the record does not support the Dietchweilers' claim that the review hearing was rigged against Noah.

It is of course well-established that due process requires "that a hearing must be a real one, not a sham or pretense." *See Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 164 (1951) (quoting *Palko v. State of Conn.*, 302 U.S. 319, 327 (1937)). Noah claims that the review hearing was a sham because the defendants refused to overturn his suspension based on the evidence from his drug test that he did not ingest drugs on either January 24th or January 25th. He also asserts that the defendants contrived to change the charges against him to the 24th so that he would be unable to defend himself.

Although we are troubled by the defendants' failure to inform Noah before the hearing that he was being accused of taking or possessing drugs on January 24th, the omission did not deprive Noah of his opportunity to be heard. *See Doherty v. City of Chi.*, 75 F.3d 318, 323 (7th Cir. 1996) (primary demand of due process is opportunity to be heard at a meaningful time in a meaningful manner). As an initial matter, we note that Noah has not provided any evidence that the defendants ever specified that the charges against him pertained only to January 25th. Although it was reasonable to assume from the suspension notice that he was accused of drug activity on

January 25th (that was of course the day of the suspension and the date listed on the form he received), neither the printed notice itself nor Noah's version of events contained any explicit statement tying his suspension to conduct occurring on January 25th. More importantly, with the exception of one witness who was prepared to testify about Noah's actions on the 25th, all of the evidence Noah presented at the hearing was equally relevant to whether he had possessed or ingested drugs on the 24th. Noah testified on his own behalf and denied any involvement whatsoever in M.M.'s distribution of Ativan; he was able to explain his version of the encounter and suspension by Mr. Lucas and Mr. Bunting; he presented the results from the drug test and explained that it conclusively demonstrated he had not ingested drugs on *either* the 24th *or* the 25th; both his parents testified in support of his claim; and one student testified on Noah's behalf that he had been with Noah on both the 24th and the 25th and saw nothing to suggest that Noah had taken or acquired drugs. The school board also heard Mr. Lucas and Mr. Bunting's version of events and was permitted to ask Noah and the Dietchweilers questions about the drug test results and what Noah meant when he said "whatever" to Mr. Lucas and Mr. Bunting.

That the board ultimately concluded that Noah was indeed guilty of having possessed Ativan does not mean the hearing deprived him of due process. Noah's chief complaint is that the Board disbelieved the evidence he presented, but due process does not guarantee that his version of events will be believed. *See Pugel*, 378 F.3d at 663 ("Due process does not require decisionmakers to adopt the charged party's explanation."). Noah had an opportunity to present his side of the story and

explain why his comment on January 25th, "whatever," should not be taken as an admission of procuring or ingesting narcotics. And although Noah has presented his own theory about why the Board may have been motivated to conspire to uphold the charges against him (he hypothesized that administrators at Watseka were willing to "burn" Noah because he was planning to transfer at the end of that school year), he has not presented specific evidence that members of the school board came to the hearing having predetermined Noah's guilt. Absent evidence that the board had made up its mind to uphold the suspension before arriving at the hearing or otherwise denied him an opportunity to defend himself, we conclude the hearing did not violate Noah's due process rights. *See Salas*, 493 F.3d at 927 (plaintiff's lack of access to a form used by defendants in their decision to terminate him did not violate due process when alleged lack of access did not prevent plaintiff from explaining his side of the story). In short, the hearing's focus on January 24th instead of January 25th did not preclude Noah from explaining his side of the story or presenting evidence of his innocence. Because the original suspension notice did not explicitly name January 25th as the date Noah allegedly possessed or ingested drugs, it was not constitutionally unacceptable for the review hearing to focus on the 24th instead. We hasten to add, however, that if the variance between the notice given Noah and the substance of the hearing had in fact hampered his ability to fairly present his defense to the charges, this would be a different case. It is easy to imagine how such a moving target could fail to provide adequate notice and opportunity to be heard, but here Noah had a sufficient opportunity to present evidence supporting his

claim of innocence; the board simply chose not to credit his version of events.

That leaves the Dietchweilers' state law claims for violations of the Illinois School Code, 105 ILCS 5/10-22.6, and the torts of intentional infliction of emotional distress and slander. When only state law claims remain after federal claims have dropped out of the case, the district court enjoys broad discretion whether to relinquish supplemental jurisdiction over the state law claims. *RWJ Mgmt. Co., Inc. v. BP Prod. N. Am., Inc.*, 672 F.3d 476, 478 (7th Cir. 2012). Indeed, when the federal claims are dismissed before trial, there is a presumption that the court will relinquish jurisdiction over any remaining state law claims. *See* 28 U.S.C. § 1367(c)(3); *RWJ Mgmt, Co.*, 672 F.3d at 479; *Al's Serv. Ctr. v. BP Prod. N. Am., Inc.*, 599 F.3d 720, 727 (7th Cir. 2010). The plaintiffs provide no reason as to why this case should deviate from that presumption, nor is there any reason to believe that the district court abused its discretion in declining to exercise supplemental jurisdiction over their state law claims.

### III.

For the foregoing reasons we AFFIRM the judgment of the district court.

ROVNER, *Circuit Judge*, with whom WOOD, *Chief Judge*, joins, concurring.

I join the court's opinion affirming the judgment of the district court and ultimately agree that given the record as a whole, the undemanding requirements of *Goss* were satisfied here. I write separately, however, to register my discomfort with the pre-suspension procedures followed here by administrators. Specifically, if we believe Noah's version of events, which we of course must at this stage, *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (reiterating our task on summary judgment to construe the record in the light most favorable to the non-movant and avoid temptation to decide which party's version of the facts is more likely true), he was never provided with *any* detail whatsoever as to the basis for the very general accusation that he was somehow "involved with" (ingesting? possessing? selling? witnessing?) drugs or drug activity at Watseka. And after denying this vague accusation, Noah says he was presented with the Hobson's choice of admitting the charges against him and being suspended or denying them and being expelled. As the court's opinion notes, *supra* at ___, *Goss* requires that if a student denies the charges against him, he be given "an explanation of the evidence the authorities have, and an opportunity to present his side of the story." 419 U.S. at 581.

Although I do not think *Goss* requires administrators to elaborate at a detailed level as to the basis of the evidence against a student, I do think as a practical matter that administrators must be forthcoming enough so as to allow a student to formulate a response to the charges and present his side of the story. *Goss* itself recognizes that it is especially important that the student be allowed to present his version of events in a case

such as this one, where the disciplinarian did not witness the charged conduct. As *Goss* explained, "things are not always as they seem to be, and the student will at least have the opportunity to characterize his conduct and put it in what he deems the proper context." 419 U.S. at 584. Noah obviously could not attempt to explain to administrators why his name might appear on a list allegedly detailing amounts owed for Ativan pills if he was never informed that such a list existed. Nor could he realistically be expected to provide much context for his behavior if he was not told with any specificity what the behavior was, who accused him of it, or what the alleged "drugs" were. Had Mr. Lucas or Mr. Bunting elaborated at all on the basis for the charges against Noah, perhaps they could have avoided the further confusion caused by the suspension review hearing's focus on what transpired on January 24th instead of the 25th.

In sum, although the bar of *Goss* is low, the stakes of suspension may be high. Even a brief suspension of ten days or less may have serious and lasting consequences on a child's short-term and long-term academic trajectory. In Noah's case, the ten-day suspension translated into the loss of a year: he was still able to transfer to Culver Military Academy as planned but was obligated to repeat his sophomore year because the online courses he completed to finish the school year were not recognized by Culver. Bearing in mind the possibility that short-term suspensions may carry lasting consequences, administrators and disciplinarians would do well to ensure that, circumstances permitting, students are given every reasonable opportunity to understand and

respond to the charges against them. With this caution in mind, I join the opinion of the court.