[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 10-15879

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 16, 2012
JOHN LEY
CLERK

D. C. Docket No. 1:07-cv-00980-CAP

JANE DOE, (a Pseudonym), as Parent, Next Friend,
and Natural Guardian of JOHN DOE (a Pseudonym),
a minor,

Plaintiff-Appellee,

versus

KAYE E. BRADDY,
JANET E. ENGLISH, et al.

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(March 16, 2012)

Before EDMONDSON and ANDERSON, Circuit Judges, and EDENFIELD,[*]
District Judge.

_____

[*]Honorable B. Avant Edenfield, United States District Judge for the Southern District of Georgia, sitting by designation.

PER CURIAM:

This substantive-due-process case involves the federal rights of a child injured while not in state custody and the applicability of qualified immunity to the acts of state social workers that allegedly led, in fact, to the child's injury.

Defendants, all state social workers, placed a teenaged minor in an adoptive home. The teenager later sexually assaulted the young grandchild of the adoptive parents. The Victim (acting through his mother) sued the state workers under 42 U.S.C. § 1983, claiming violation of his federal substantive due process rights. Defendants moved for summary judgment on qualified immunity grounds, but the District Court denied the motion. Defendants appeal.

Because the preexisting law at the pertinent time did not clearly establish that the Victim's federal rights would be violated by the state workers' acts, we reverse the District Court's decision and remand the case for dismissal of the federal claims against Defendants in their individual capacities.

## I.  Background[1]

This case involves a sexual assault on a five-year old boy ("John Doe") by a sixteen-year old male ("C.H.").  C.H. -- through the acts of state workers -- had been placed in an adoptive home: the Templeton home, the place of the assault.

John Doe is the son of Jane Doe and the grandson of Gwen and Harold Templeton.  Gwen Templeton saw a television program that featured C.H.  She became interested in adopting him.  C.H. then was in state custody in Laurens County, Georgia; the Templetons lived in Cherokee County, Georgia.  At the pertinent times, Defendants were all state social workers.

## C.H.'s Life History and Allegations of Abuse and Inappropriate Conduct

C.H. had a troubled upbringing -- he had been in foster care since he was about 2 years old.  When C.H. became available for adoption at age 14, he was living in a foster home with other children in Laurens County.  In July 2003, Defendant Braddy visited C.H. at the foster home and was told by a male foster

---

[1]In this review of the denial of summary judgment, we set forth the evidenced facts in the light most favorable to Plaintiffs, the non-moving party. See Andujar v. Rodriguez, 486 F.3d 1199, 1202 n.1 (11th Cir. 2007). These facts are supposed for today's decision.

child that C.H. had touched him on the chest.  Braddy's documents indicate that some child (uncertainty exists about whether it was a different child) also said C.H. asked him to go behind the school and let C.H. bounce on his lap.  These comments, according to Braddy's notes, made the child (or maybe the two children) feel uncomfortable.  In response to the reported conduct, Braddy recommended "wrap around" services, which means C.H. would -- and did -- receive therapy while in the foster home.  Other record evidence indicates C.H. -- before later going into the Templeton's home -- had at times been physically violent and threatening to peers and adults.[2]

In March 2004, C.H.'s then-foster mother contacted Braddy and said she had found a pouch hidden in C.H.'s room.  The pouch included pictures of naked men and women, as well as photos of C.H.'s genitals.  The foster mother said a child had reported that C.H. had shown him some of the photos of C.H.'s genitals.

---

[2]Some of this evidence includes C.H. cutting a girl with a knife, striking an adult, and threatening to set a girl on fire and "blow up" a boy.

Dr. Whitley's Evaluation of C.H.

On 9 March 2004, in response to things like the foster mother's allegations, Braddy accompanied C.H. to a psychologist, Dr. Whitley. Braddy relayed the allegations and instances of C.H.'s misconduct. She also disclosed that C.H. had recently said his grandfather had molested him in the past. Among other things, Braddy asked for recommendations about placement for C.H. During Whitley's examination, C.H. denied his being sexually abused and his acting out in a sexual way.

In his report ("the Whitley Report"), Whitley recounted the inappropriate touching and other allegations. Whitley also noted the photographs found in the zipped pouch. The Whitley Report included the following recommendations:

> "Based on the above information, it is recommended that [C.H.] be placed [in] a group home or residential treatment facility, as opposed to a family foster home where other children might be vulnerable to his sexual acts. Nevertheless, any placement decisions should be based on input from his caregivers, and the professionals working with him."

Whitley recommended that C.H. receive treatment that gives "attention to matters of sexuality," finding that it is "unclear whether [C.H.] has empathy for those to whom he makes unwanted sexual advances." Whitley also made this observation:

> "Until appropriate placement and treatment can be arranged, [C.H.] requires very close supervision, and should never be left alone with other children, and he should not share a bedroom with other children."

Other psychological reports had been made about C.H. in the past -- including one authored by a Dr. Anderson in 2003. But Whitley's was the most explicit report about C.H.'s sexual issues.

After Dr. Whitley's evaluation, C.H. was placed in a different group home in March 2004. Braddy did enroll C.H. in additional counseling, although Plaintiffs dispute whether C.H. ever actually completed this course of counseling. No further information of sexual incidents arose during this time: that is, after the Whitley examination (on 9 March 2004) and before C.H. went into the Templeton home (on 17 December 2004).

<u>C.H.'s Placement in the Templeton Home</u>

In December 2003, after seeing a television program that C.H. was in, Gwen Templeton felt moved to adopt him. Jane Doe and her son, John Doe, lived in the Templetons' home from about April 2002 to about August 2004. The Does then moved out for a while. Around October or November 2004, Jane Doe began to move her and her son John back into the Templetons' home. Record evidence shows that, at times, accounts of who resided in the Templeton home were not consistent. For example, around March 2004, Gwen Templeton wrote in a questionnaire for prospective adoptive parents that Jane and John Doe lived in the Templeton house. But in an application for adoption dated 18 April 2004, Gwen Templeton wrote "None" in the space to list "children at home."

As a preliminary step to C.H.'s possible adoption, Defendant English compiled C.H.'s "life history"; a "life history" typically consists, among other things, of a narrative, social updates, and medical and psychological records. English (of Laurens County) forwarded the life history report to Defendant Evans of Cherokee County (where the Templetons lived). English and Evans testified that the life history report sent by English and received by Evans included a copy of the Whitley Report and other psychological evaluations. But English also

testified that she did not update other portions of C.H.'s file with information taken from the Whitley Report.[3]

Before C.H. went to live in the Templetons' home, Evans conducted a home study by going to the Templetons' home in the summer of 2004. Later, Evans met with Gwen Templeton on 2 November 2004 (Harold Templeton did not attend). Gwen Templeton says that she was given a "big book of information" but that she did not look at it because "[i]t was just too much." She was also separately given Dr. Anderson's report, which is a 7-page document prepared in January 2003 that does not discuss C.H.'s sexual issues. Gwen Templeton took Dr. Anderson's report. She did not ask about the existence or availability of newer information. Gwen Templeton says the choice, at the time, was either to sit there and look through the "big book" with Evans or otherwise to take Dr. Anderson's report. She did not go through the "big book."

On 19 November 2004, the Templetons met with several government social workers. A portion of C.H.'s life history was discussed. Gwen Templeton remembers hearing that C.H. may have been sexually abused as a child and that he was looking at pictures of naked men. She does not remember discussion about

_____

[3]In deposition testimony English testified, "I don't care whether I read it [the Whitley Report] or not. I wasn't taking the child into my home."

8

whether C.H. inappropriately touched another child. One of the social workers asked the Templetons if they would be comfortable if C.H. had a same-sex preference. The Whitley Report and its recommendations were not discussed.

On 17 December 2004 (the placement date), the Templetons met with Braddy and English to pick up C.H. from the group home where he was living and take him to the Templetons' home where he was then to reside. The Templetons were provided with C.H.'s life history: a lot of material. Each Templeton reviewed it some time later. Both Templetons say they did not see the Whitley Report and were not made aware of the Report or its contents during the adoption process.

Post-Placement

After C.H. was residing with the Templetons, Defendant Giersberg made several visits to the Templeton home between January and May 2005. On her first visit, she became aware that Jane and John Doe were at the home. Giersberg never showed the Templetons the Whitley Report, but says she discussed (in general terms) with Gwen Templeton C.H.'s earlier inappropriate conduct. In May 2005, Giersberg recommended finalizing the adoption.

9

In June 2005, Jane Doe learned from her son, John Doe, that C.H. (then 16 years old) had sexually abused John Doe (then 5 years old). C.H. was arrested and removed from the Templetons' home. Jane Doe says she learned of the Whitley Report sometime later. Jane Doe says she then confronted her parents, the Templetons, who disavowed knowledge of the Whitley Report.

## II. Discussion

### Qualified Immunity

"If the law at that time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation. It is important to emphasize that this inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." Brosseau v. Haugen, 125 S. Ct. 596, 599 (2004) (internal quotations and citation omitted).

Qualified immunity to a great extent protects government officials performing discretionary functions; it should protect all officials except "the plainly incompetent or those who knowingly violate the law." Malley v. Briggs,

10

106 S. Ct. 1092, 1096 (1986). And government actors are not required to err on the side of caution. Davis v. Scherer, 104 S. Ct. 3012, 3020 (1984).

Here, in placing C.H. with an adoptive family, Defendants were unquestionably state officials acting within the scope of their discretionary authority. So, Plaintiffs bear the burden of showing that qualified immunity does not apply.

In this case, because the preexisting law at the time did not already clearly establish that what the social workers did violated the Victim's federal rights, we must reverse the District Court's denial of summary judgment. Defendants are entitled to qualified immunity.

### Whether the Victim's Federal Rights were "Clearly Established" Given the Circumstances

The Victim in this case, John Doe, was not in the custody of the state. John Doe was a person who was present and living freely with his mother in the Templetons' home. Plaintiffs claim that John Doe had a right of safety by virtue of the federal doctrine of substantive due process.

Only in limited circumstances does the Constitution impose affirmative duties of care on the state. See DeShaney v. Winnebago Cnty. Dep't of Soc.

11

<u>Servs.</u>, 109 S. Ct. 998, 1003-04 (1989). And we have written that only custodial relationships automatically give rise to a governmental duty, under substantive due process, to protect persons from harm by third parties. <u>White v. Lemacks</u>, 183 F.3d 1253, 1257 (11th Cir. 1999).

A decision about a substantive due process violation requires an exact examination of the circumstances. For substantive due process purposes, we have never addressed the question of harm caused to a person situated as John Doe was situated: one in no custodial relationship with the state -- in the specific context of a third-party minor injured by another child in an adoptive home setting.

But we have said that, if the plaintiff alleging the rights violation is in no custodial relationship with the state, then state officials can violate the plaintiff's substantive due process rights only when the officials cause harm by engaging in conduct that is "arbitrary, or conscious shocking, in a constitutional sense." <u>Id.</u> at 1259 (quoting <u>Collins v. City of Harker Heights</u>, 112 S. Ct. 1061, 1070 (1992)). "[O]nly the most egregious official conduct can be said to be arbitrary in the constitutional sense." <u>County of Sacramento v. Lewis</u>, 118 S. Ct. 1708, 1716 (1998) (internal quotations omitted). In addition, this standard "is to be narrowly interpreted and applied," <u>White</u>, 183 F.3d at 1259, such that "even intentional

12

wrongs seldom violate the Due Process Clause." Waddell v. Hendry Cnty.

Sheriff's Office, 329 F.3d 1300, 1305 (11th Cir. 2003).[4]

For qualified immunity purposes in this case, the federal law applicable to the specific circumstances of this case was not close to established clearly at the pertinent time. The general legal propositions discussed above about substantive due process and non-custodial relationships are vague in themselves, and more so in their possible application to the circumstances of a case like this one, involving, among other things, an adoptive home setting and a victim not in the custody of the government. Moreover, qualified immunity's "clearly established" test does not operate at a high level of generality: "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right . . . the unlawfulness must be apparent." Anderson v. Creighton, 107 S. Ct. 3034, 3039 (1987). Furthermore, if case law is necessary to show unlawfulness, that decisional law must apply with "obvious clarity" to the officials' own conduct -- what they are doing -- to give "fair warning" to the

---

[4]"[T]he measure of what is conscious shocking is no calibrated yard stick . . . ." Lewis, 118 S. Ct. at 1717 (1998). At the very least, in a non-custodial setting a substantive due process violation -- as we have said in some other non-custodial settings -- requires the plaintiff to make a showing of deliberate indifference to an extremely great risk of serious injury, although the required showing might actually be far higher. Waddell, 329 F.3d at 1306 n.5. About the exact standard for the context of this case, we do not decide for certain. See id.

officials that their specific conduct violates federal law.  See Hope v. Pelzer, 122

S. Ct. 2508, 2516 (2002).

In no way did Waddell -- an opinion cited by Plaintiffs -- clarify or

particularize the liability standard (even roughly) for a case of this kind.[5]  Waddell

explicitly declined to declare the precise liability standard to be employed in non-

custodial substantive due process cases even of the kind presented in Waddell.

So, Waddell, like the other decisions Plaintiff cites, cannot apply to the facts of

this case with "obvious clarity" and, therefore, is incapable of having provided the

social workers "fair warning" of the alleged unlawfulness of their acts.  And all

the child-injury cases cited by Plaintiffs are too readily distinguishable, involving

children injured while in state custody and, thus, cannot provide "fair warning" in

the particular circumstances of this case: a child injured while not in state

custody.[6]

---

[5]Waddell ruled for the defendants and presented an entirely different factual context.  Briefly stated, in Waddell the plaintiffs alleged a substantive due process violation against state officials in the context of an automobile collision involving a confidential informant who had been released from jail and was driving one of the cars.  The facts of Waddell, therefore, are entirely different from the facts of this case.

[6] E.g., H.A.L. ex rel. Lewis v. Foltz, 551 F.3d 1227 (11th Cir. 2008) (finding no qualified immunity at motion to dismiss stage for state social workers who were deliberately indifferent to the clearly established right of a foster child in state custody to be reasonably safe from sexual abuse); Taylor v. Ledbetter, 818 F.2d 791 (11th Cir. 1987) (en banc) (finding foster child in state custody can state a section 1983 cause of action if injury occurs after state employee's deliberate indifference to a known and substantial risk of serious harm).

14

In addition, Plaintiffs cite no binding authority -- and we have found no Georgia Supreme Court decision and no binding authority -- that requires, for federal substantive due process purposes, that all psychological information about a potential adoptive child always be turned over to and called to the attention of the potential adoptive parents.

Finally, even when the broad "arbitrary, or conscious shocking, in a constitutional sense" general proposition is applied to the facts and context of this case, our conclusion on immunity would remain the same. Even when we assume the law is clearly established at this high level of generality, the state workers' acts were not "clearly unlawful in light of pre-existing law." McClish v. Nugent, 483 F.3d 1231, 1248 (11th Cir. 2007) (emphasis added).

The Whitley Report, upon which Plaintiffs rely most heavily, was due to be given some weight by the social workers. And the record shows that it was, at least to some degree. For federal constitutional purposes, the social workers were not obviously legally obliged to do exactly what Dr. Whitley recommended. Furthermore, the Whitley Report seems to acknowledge that "any placement decisions should be based on input from [C.H.'s] caregivers, and the professionals working with him."

Whitley explicitly qualified his recommendation with the caveat that the professionals working with C.H. should have a say in the placement decision (and possibly override Whitley's recommendation against placing C.H. in a home with other children). Determinations of what constitutes egregious conduct by state officials "must not be made in the glow of hindsight." Waddell, 329 F.3d at 1305. Based on all the information available at the time, the decision -- even if incorrect and ultimately harmful, in fact, to John Doe -- to place C.H. in this adoptive home just was not obviously arbitrary or conscious shocking in a constitutional sense.

This case is not the rare case where the officials' conduct was so egregious that the officials should have known their acts were contrary to federal constitutional commands, even in the absence (as is true here) of relevant case law. Such cases are "exceptional" and "rarely arise." See Santamorena v. Ga. Military Coll., 147 F.3d 1337, 1340 n.6 (11th Cir. 1998) (substantive due process case).

## III.  Conclusion

"[T]he [Supreme] Court has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this

<u>uncharted area are scarce and open-ended</u> . . . The doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field." <u>Collins v. City of Harker Heights</u>, 112 S. Ct. 1061, 1068 (1992) (internal citation omitted) (emphasis added).

To rule against the individual defendants in this case would definitely break new ground. The contours of John Doe's claimed due process right were not at all clear in the circumstances, and the alleged unlawfulness (under the preexisting federal law) of the social workers' acts was far from obvious.[7] No truly relevant case law applied with "obvious clarity" to what the social workers were doing. The preexisting law gave no "fair warning" of the alleged unlawfulness (under federal law) of their acts in advance of their acts. Given the circumstances, the developed federal law at the time stopped well short of clearly establishing the unlawfulness of the social workers' conduct. So under the law, the individual defendants have the right to immunity.

The District Court erred in denying Defendants' summary judgment motion.

REVERSED and REMANDED.

---

[7]In these kinds of personal-injury based substantive due process cases, we are always guided by the Supreme Court's statement that "the Fourteenth Amendment is not a 'font of tort law to be superimposed upon whatever systems may already be administered by the States.'" <u>Lewis</u>, 118 S. Ct. at 1718 (1998) (quoting <u>Paul v. Davis</u>, 96 S. Ct. 1155, 1160 (1976)).