**Jeffrey KOEPPEL, Plaintiff,**

**v.**

**Joyce C. ROMANO, Joseph M. Sarrubbo, Jr., Thomas Decker and Sanford C. Shugart, Defendants.**

**Case No: 6:15–cv–1800–Orl–40KRS**

United States District Court,
M.D. Florida,
Orlando Division.

Signed May 11, 2017

Bradley Silverman, Kimberly C. Lau, Warshaw Burstein, LLP, New York, NY, Connis O. Brown, III, Seth P. Robert, Brown Robert, LLP, Ft Lauderdale, FL, for Plaintiff.

Richard L. Barry, Richard E. Mitchell, Orlando, FL, for Defendants.

## ORDER

PAUL G. BYRON, UNITED STATES DISTRICT JUDGE

Plaintiff, Jeffrey Koeppel ("Koeppel"), sues Valencia College administrators, Joyce C. Romano ("Romano"), Joseph M. Sarrubbo Jr. ("Sarrubbo"), Thomas Decker ("Decker"), and Sanford C. Shugart ("Shugart"), in their individual capacities, for their involvement in Koeppel's disciplinary suspension from Valencia College. (Doc. 73). Before the Court at this time are the following:

1. Defendants' Motion to Dismiss Plaintiff's Third Amended Complaint, or in the Alternative, Motion for Summary Final Judgment (Doc. 79), filed October 24, 2016;

2. Plaintiff's Response in Opposition to Defendants' Motion to Dismiss and Alternative Motion for Summary Judgment (Doc. 91), filed November 11, 2016;

3. Defendants' Reply to Plaintiff's Response to Motion to Dismiss and Alternative Motion for Summary Judgment (Doc. 101), filed November 28, 2016;

4. Plaintiff's Motion for Partial Summary Judgment (Doc. 125), filed February 1, 2017;

5. Defendants' Response in Opposition to Plaintiff's Motion for Partial Summary Judgment (Doc. 137), filed February 21, 2017, and;

6. Plaintiff's Reply in Further Support of Motion for Partial Summary Judgment (Doc. 143), filed March 8, 2017.

Upon consideration and review of the record, including all pleadings, deposition transcripts, affidavits, exhibits, and the parties' respective legal memoranda, the Court will grant Defendants' Motion for Summary Judgment on all Counts.

## I. BACKGROUND

During the summer of 2014, Koeppel was a 42–year-old male nursing student attending Valencia College ("Valencia"), a public community college in Orlando, Florida. (Doc. 125, p.3). All students enrolled at Valencia are "deemed to have given [their] consent to the policies of the College, the State Board of Education, and the laws of Florida." (Doc. 137–1, p. 1). Valencia's Student Code of Conduct establishes that:

The College reserves the right to take necessary and appropriate action to protect the safety and wellbeing of the campus community. This Code is adopted for the appropriate discipline of any student ... who acts to impair, interfere with, or obstruct the orderly conduct, processes, and functions of the College.

This Code may apply to acts conducted on or off campus when relevant to such orderly conduct, processes, and functions.

(*Id.*).

While attending Valencia, Koeppel was a classmate and study partner with a 22–year-old female student, referred to in this case as Jane Roe ("Jane"). (*Id.*). On August 11, 2014, Jane filed a complaint against Koeppel with Valencia's Safety and Security Department reporting that Koeppel had communicated to her "sexually disturbing pictures of [Keoppel] and other women" and "very disturbing sexual comments," and that he had "texted [her] that night until 4:30 a.m. being hateful and nasty about [her] body." (Doc. 137–2, pp. 1–2). In support of her complaint, Jane submitted a copy the text messages Koeppel sent to her on August 3, 2014, starting around 10:00 p.m. and continuing until past 4:00 a.m. (Doc. 79–2, pp. 13–15). The text messages included comments such as, "Just sucks I didn't wear your pussy out," "Believe me i have had plenty of sex with you even if you werent present," "What u think i was thinkin bout when ur in them tiny whore shorts," "Your little butt cheeks hanging out Yum yum!!!!!," and "Starbucks date—a 6.5 oz can of expresso and cream—despite the fact that it is not carbonated when opened it tends to eject some of its contents directly into ones face." (*Id.*).

During the course of Koeppel's text message barrage, Jane asked Koeppel to stop contacting her several times. (Doc. 79–3, p. 3). Eventually, Jane's boyfriend called the police, and Deputy Sheriff Brenton Rush ("Deputy Rush") responded to the call. Deputy Rush testified that Jane "was very upset" when he arrived at her apartment. Jane reported that Koeppel was harassing her via phone calls and text messages that were "threatening in nature" and that "she was scared" of Koeppel. (Doc. 137–6, 16:22–17:1). Jane asked Deputy Rush "to make contact with [Koeppel] just to let him know that she doesn't want any contact with him at all." (*Id.* at 13:2–14:3). Jane provided Deputy Rush with Koeppel's phone number, and Deputy Rush called Koeppel and advised him to stop communicating with Jane. (*Id.* at 23:14–25, 24:18–24). Deputy Rush reported that, during the phone call, Koeppel admitted to sending Jane texts and pictures. (*Id.* at 21:10–12). Deputy Rush also called the campus Dean, Sarrubbo, and informed him of the incident. (*Id.* at 35:19–24).

On August 11, 2014, Jane filed a complaint with Valencia's security department, reporting the following:

I met Jeffery in the beginning of summer classes in Biology with professor Dr. C. We exchanged phone numbers as he was in my lab group. We then started studying together at his house in Lake Mary and Panera as well as starbucks [sic]. I told the man I had a boyfriend and this was only school related stuff. After Biology ended he would continue to text me and call me. Told me he had a computer he was going to buy me and wanted to come to my house to set it up. I never let him come to my house.

On Sunday (Aug 3, 2014) night he kept calling me and texting me as I was watching a movie. My phone wouldn't stop blowing up. He told me he saw my sons father (boyfriend) . . . on Facebook as well as my ex boyfriend. He [then] progressed and started sending me sexual disturbing pictures of him and other women. I got on the phone with him he told me very disturbing sexual comments.

My boyfriend got on the phone with him. [Koeppel] told him he was going to put a gun on him and kill him. That I was a hussie and a slut. [Koeppel] texted me ugly things and wouldn't stop. I [then]

called the police from my house and told them what happened, got a case number. [Koeppel] then called me immediately when I got back up to my apartment from an unknown number. He texted me that night until 4:30 a.m. being hateful and nasty about my body and my boyfriend. The police called [Koeppel] and the police officer told me [Koeppel] and I had the same exact story of what happened.

(Doc. 79–1, pp. 8–9).

On August 13, 2014, Sarrubbo, sent an email to Koeppel notifying him that the Dean of Student's Office received information alleging violations of Valencia's Student Code of Conduct. The email informed Koeppel that, as a result of the information received, Koeppel was no longer enrolled in a course for the fall 2014 semester and that a "No Contact Order" had been put into place prohibiting Koeppel from having any further communication with Jane. (*Id.* at pp. 18–19). The email also instructed Koeppel to make an appointment with Sarrubbo to discuss the incident. The email stated that "[a]t your appointment, you will have the opportunity to discuss the incidents in their entirety." (*Id.*). In an email sent later that same day, Sarrubbo further explained that the meeting "will be your opportunity to present your side of the story. Bring as much pertinent documentation/information that you feel is necessary .... As of now, we will treat our meeting as your opportunity to present your case unless additional information requires us to meet again." (*Id.* at p. 29).

Koeppel admits to receiving Sarrubbo's August 13th email with the No Contact Order on the day it was sent. (Doc. 137–5, 31:21–31:6). Nonetheless, Koeppel sent Jane twenty additional text messages on August 14, 2014, in violation of the No Contact Order. (*Id.* at 32:13–23).

On August 15, 2014, Sarrubbo conducted an informal conference with Koeppel. During this meeting, Koeppel admitted to sending Jane approximately 100 text messages on the night of August 3, 2014, including images of a "[g]irl [Koeppel] used to know pretending to give a blow-job," messages calling Jane a "hussy," and other messages intended to "hurt her feelings." (Doc. 79–1, p. 15). Based on this meeting, coupled with the information provided by Jane, Sarrubbo determined that it was likely that Koeppel violated portions of Valencia's Student Code of Conduct through his interactions with Jane, and that, therefore, a formal disciplinary hearing was warranted. (Doc. 137–7, 191:4–17).

On August 19, 2014, Sarrubbo notified Koeppel that he was being referred for a mandatory disciplinary hearing in front of the Student Conduct Committee (the "Committee") to be held on August 25, 2014. (Doc. 79–1, p. 26). On August 21, 2014, Sarrubbo met with Jane to "get her official version of events." (Doc. 79–1, p. 3–4, ¶ 17). During the meeting, Jane provided Sarrubbo with copies of the text messages and pictures that Koeppel sent Jane. (*Id.*). The next day, Koeppel inspected his student conduct file, including the pictures and texts provided by Jane. (*Id.* ¶ 18). The day before the hearing, Koeppel emailed Sarrubbo a "fourteen page Word document of his recovered text messages." (*Id.* ¶ 18). The text messages listed in the Word document omitted several of the text messages reported by Jane, including "Just sucks i didn't wear your pussy out," and "Believe me i have had plenty of sex with you even if you werent present." (Doc. 79–4).

Prior to the disciplinary hearing, Sarrubbo met with the disciplinary hearing committee members (the "Committee Members"). (Doc. 79–1, p. 5, ¶ 21). The Committee Members included a Valencia student and the following Valencia employees: Rafael Davila (counselor), Defendant

Decker (security manager), and Natalie Hofreiter (academic advisor). Sarrubbo served as chair of the Committee. (*Id.*). In preparation of the meeting, Committee Members reviewed Koeppel's student conduct file, including the text messages provided by Jane and the recovered text messages submitted by Koeppel. (*Id.*). The disciplinary hearing was held on August 25, 2014. (*Id.* ¶ 22). The Committee members questioned Koeppel about the underlying facts of his case. According to the Committee Members, Koeppel never claimed that he was innocent of the charged conduct; instead, Koeppel debated with the Committee Members about whether his conduct met the definition of "sexual harassment," and argued that his conduct was vindicated based on his relationship with Jane. (*Id.* ¶ 23).

After the Committee Members completed their questioning, Koeppel was permitted to present any further information he wanted the Committee to consider. (*Id.* ¶ 24). After he finished his presentation, the Committee Members deliberated whether Koeppel committed the charged conduct based on a "greater weight of the evidence" standard. (*Id.*). Because Koeppel admitted to his conduct, the Committee Members found the standard to be fully satisfied. (*Id.*).

Accordingly, the Committee Members unanimously recommended upholding the following charges against Koeppel:

> 'physical abuse' by conduct threatening Jane's health and safety; (ii) 'sexual harassment' by making unwelcome sexual advances towards Jane creating an intimidating, hostile, or offensive environment; (iii) 'stalking behavior' by repeatedly engaging in a willful malicious and repeated course of conduct which reasonably and seriously harmed, tormented, or terrorized Jane and served

> no legitimate purpose; and (iv) 'disorderly and lewd conduct.'

(*Id.* ¶ 25).

Sarrubbo notified Koeppel of the Committee's decision in an email on August 26, 2014. (Doc. 79–6, pp. 3–4). The email also informed Koeppel that he was placed on "Disciplinary Suspension," to take effect immediately. (*Id.*). Although the suspension prohibited Koeppel from attending credit and non-credit courses at any Valencia location, he was permitted to apply for readmission at the beginning of the fall 2015 term. The email concluded by informing Koeppel that he may appeal his suspension within seven days of the email. (*Id.*).

On August 27, 2014, Koeppel notified the Vice President of Student Affairs, Defendant Romano, that he was appealing the Committee's determination. (Doc. 79–6, p. 6). In his notice, Koeppel expressed "regret [for] having sent the messages." He argued, however, that "the mitigating circumstances (especially the history of the two parties), the context, and the incident, when considered in whole, preclude the complaint from being considered harassment, sexual harassment, or stalking." (*Id.*). Koeppel urged that an appropriate sanction would be limited to probation and a warning. (*Id.*).

In a letter dated September 4, 2014, Romano denied the appeal, explaining:

> While you were forthright in admitting your behavior in this incident, your inability to self-monitor and control you interactions after you were told to do so by two different professionals and your inability to understand the impact of your behavior on the other student were cause for concern.

> We have zero tolerance for any threatening or aggressive behavior in the Valencia College community. I believe that the student conduct committee's review

and recommendation on this situation upholds the behavioral standards that we expect in our college community and are not unwarranted or excessive.

(Doc. 79–6, p. 9).

Keoppel initiated this lawsuit on October 23, 2015, bringing claims against Valencia, the District Board of Trustees of Valencia College ("the Board"), Romano, Sarrubbo, Decker, and Valencia's president, Shugart. The Court previously dismissed Valencia and the Board based on Eleventh Circuit immunity. (Doc. 72). Koeppel's remaining claims against Romano, Sarrubbo, Decker, and Shugart consist of the following: (1) a § 1983 action for violation of procedural due process (Count II); (2) a § 1983 action for violation of substantive due process (Count IV); (3) flawed procedure and erroneous outcomes in violation of Title IX (Count V); and (4) § 1983 actions for violation of the First Amendment (Counts VII and IX).

## II. STANDARD OF REVIEW

To prevail on a summary judgment motion, the movant must show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court must "view the evidence and all factual inferences therefrom in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in favor of the non-movant." *Davila v. Gladden*, 777 F.3d 1198, 1203 (11th Cir. 2015) (quoting *Carter v. City of Melbourne*, 731 F.3d 1161, 1166 (11th Cir. 2013) (per curiam)). "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case. An issue of fact is 'genuine' if the

record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Brooks v. Cty. Comm'n of Jefferson Cty.*, 446 F.3d 1160, 1162 (11th Cir. 2006) (quoting *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990)).

## III. DISCUSSION

Defendants move for summary judgment on all claims (Doc. 79), and Koeppel moves for partial summary judgment on his First Amendment claims (Doc. 125). The Court will analyze each Count and the parties' respective arguments accordingly.

### A. Count II—Procedural Due Process (§ 1983)

█ In Count II, Koeppel brings a § 1983 action for violation of his procedural due process rights. Koeppel claims that he had a protected property and liberty interest in continued enrollment at Valencia, and that Defendants' actions deprived Koeppel of that interest without constitutionally adequate pre- or post-deprivation processes. (Doc. 73, p. 48).

█ The Due Process Clause of the Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV. Students attending public universities have a property interest in their continued enrollment at a "public institution of higher learning." *Dixon v. Ala. State Bd. of Educ.*, 294 F.2d 150, 156–57 (5th Cir. 1961).[1] The Fourteenth Amendment thus requires that stu-

---

1. The Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions made prior to September 30, 1981. *Bonner v. City of* *Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

dents who are subject to suspension or expulsion be provided with "the opportunity to be heard at a meaningful time and in a meaningful manner." *Castle v. Appalachian Tech. Coll.*, 631 F.3d 1194, 1200 (11th Cir. 2011) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)). Indeed, the Supreme Court has held that, even with a suspension, a student should receive notice and a hearing. *Goss v. Lopez*, 419 U.S. 565, 581–82, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). "[T]he student [should] be given oral or written notice of the charges against him, and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story. The clause requires at least these rudimentary precautions against unfair or mistaken findings of misconduct and arbitrary expulsion from school." *Id.*

The Court finds that these procedural processes were met in this case. Koeppel was provided with written notice of the charges against him. In his email dated August 13, 2014, Sarrubbo informed Koeppel that the school had received reports that Koeppel "called and text messaged sexually harassing statements and pictures to a former Valencia classmate." (Doc. 79–1, p. 18). The email further explained that this conduct was in violation of Valencia's Student Code of Conduct for physical abuse; sexual harassment; stalking; and disorderly and lewd conduct. (*Id.*). The email thus adequately informed Koeppel, in writing, of the charges against him.

Koeppel was likewise given an opportunity to explain his side of the story on two different occasions: First, when Koeppel met with Sarrubbo on August 15, 2014, and second, during the formal disciplinary hearing before the Committee on August 25, 2014. Koeppel argues, however, that he did not receive a fair and impartial hearing. (Doc. 92, p. 24). Koeppel disputes the sufficiency of the hearing process for sev-

eral reasons. First, Koeppel objects to the Committee Members meeting prior to the disciplinary hearing to review Koeppel's file. Second, Koeppel argues that the fact that the Committee chose not to record the disciplinary hearing "implies that they had something to hide and also hindered any potential challenge by [Koeppel] to the adequacy of the hearing." (*Id.* at p. 25). Third, Koeppel objects to the fact that witnesses such as Jane and her boyfriend were absent from the hearing, arguing that "it is improper (and a violation of due process) for decision makers to base decisions on *ex parte* communications with witnesses, particularly where those witnesses do not attend the hearing." (*Id.*). And lastly, Koeppel appears to take issue with the "tone" of the Committee Members during the hearing, claiming that "[b]ased on the tone and nature of their questions during the hearing (rhetorical and otherwise), they appeared to be sure of their conclusion by the time the hearing started." (*Id.*).

The Court finds all of these arguments unavailing. The requirements of due process are that there must a notice and a meaningful opportunity to be heard. *See, e.g., Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 313, 70 S.Ct. 652, 94 L.Ed. 865 ("[A]t a minimum [due process] require[s] ... notice and opportunity for hearing appropriate to the nature of the case."). "It is by now well established that due process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstance." *Gilbert v. Homar*, 520 U.S. 924, 930, 117 S.Ct. 1807, 138 L.Ed.2d 120 (1997) (internal quotations and citations omitted); *see also Hatcher v. Bd. of Pub. Educ. & Orphanage for Bibb Cty.*, 809 F.2d 1546, 1553 (11th Cir. 1987). Rather, "due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S.

471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). There is no due process requirement that a hearing be recorded, or that all witnesses be present, or that prohibits Committee Members from reviewing the case prior to a formal hearing. Such requirements are simply not necessary for a constitutionally-adequate opportunity to be heard.

█ It is true that the absence of witnesses *may* suggest that a hearing was constitutionally inadequate. For example, in *Furey v. Temple University*, 884 F.Supp.2d 223 (E.D. Pa. 2012), a student challenged his expulsion from Temple University after his arrest for aggravated assault on a police officer. In that case, the student requested that certain witnesses of the crime attend the hearing. When the witnesses did not attend the hearing, the student alleged that he was denied adequate due process. The district court found that the "absence of the witnesses ... affected the fundamental reliability and fairness in the Hearing." *Id.* at 255. The court explained, however, that "when a hearing on serious charges turns on issues of credibility ... the importance of a fair tribunal ... is heightened." *Id.* at 254. Indeed, the court clarified that "[i]n the normal course of disciplinary proceedings, [the hearing] would be sufficient." *Id.*

The facts of the case at hand are distinguishable from the facts in *Furey*. In this case, Koeppel did not request any witnesses to attend the hearing. Moreover, Koeppel did not dispute the underlying facts of his case, and in fact, admitted to his behavior. Thus, there were no credibility issues as there were in *Furey*. Koeppel was given the statements and evidence provided by all of the witnesses in his case and Koeppel did not request to have any witnesses present. Accordingly, the Court finds that the absence of witnesses at his discipline hearing did not violate Koeppel's due process rights.

Because Koeppel was notified of the charges against him, given sufficient opportunity to review his file, present his case, and explain his version of the facts, the Court finds that the basic requirements of procedural due process were met in this case. Such a determination is supported by ample precedent where due process was found to be met with less procedure than was afforded in this case. For example, in *Dietchweiler by Dietchweiler v. Lucas*, 827 F.3d 622 (7th Cir. 2016) (per curiam), the Seventh Circuit found the minimum requirements for due process were met where the school "administrators explained to both [the plaintiff] and his parents the general nature of the charges against him and provided him with a written suspension notice which [the plaintiff] signed to acknowledge that he had been given an opportunity to provide his version of events." *Id.* at 628. Likewise, in *Harris ex rel. Harris v. Pontotoc County School District*, 635 F.3d 685, 691–92 (5th Cir. 2011), the Fifth Circuit held that a student subject to suspension received all the due process required when "[h]e received the written charges on the day he was suspended" and "his parents had numerous opportunities to meet with school officials, to hear some of the charges, and to explain and respond." *Id.* at 691–92 And in *Salau v. Denton*, 139 F.Supp.3d 989 (W.D. Mo. 2015), *appeal dismissed*, (8th Cir. 15–3354) (Dec. 11, 2015)), a college student accused of sexual misconduct was determined to have received constitutionally adequate due process when he "received notice of the charges, identification of the violations charged, and the opportunity to present his case even though he refused to participate." *Id.* at 1004. Similarly here, because Koeppel received the basic requirements of due process—notice and an opportunity to be heard—there is no actionable due process violation.

Accordingly, Defendants are entitled to summary judgment on Count II.

## B. Count IV—Substantive Due Process (§ 1983)

In Count IV, Koeppel brings a § 1983 action for violation of his substantive due process rights, claiming that "Defendants' actions in implementing, enacting and enforcing [Valencia's] Policies and Procedures were the product of arbitrary state action rather than a conscientious, careful, and deliberate exercise of professional judgment." (Doc. 73, ¶ 227).

■■■ "The substantive component of the Due Process Clause protects those rights that are 'fundamental,' that is, rights that are 'implicit in the concept of ordered liberty.'" *McKinney v. Pate*, 20 F.3d 1550, 1556 (11th Cir. 1994) (en banc) (quoting *Palko v. Connecticut*, 302 U.S. 319, 325, 58 S.Ct. 149, 82 L.Ed. 288 (1937)). In other words, "substantive due process rights are created only by the Constitution." *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 229, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985) (Powell, J. concurring).

■■ Defendants argue that Koeppel's substantive due process claim fails as a matter of law because Koeppel does not have a constitutional right to attend Valencia. (Doc. 79, p. 19). Indeed, the Eleventh Circuit has dismissed a student's substantive due process claim challenging his dismissal from a state university, explaining that "education is not a right granted to individuals by the Constitution." *Wells v. Columbus Tech. Coll.*, 510 Fed.Appx. 893, 896 (11th Cir. 2013) (per curiam) *cert. denied*, —— U.S. ——, 134 S.Ct. 958, 187 L.Ed.2d 814 (2014); *see also C.B. By & Through Breeding v. Driscoll*, 82 F.3d 383, 387 (11th Cir. 1996). Based on this precedent, Koeppel's claim for substantive due process fails as a matter of law because there is no constitutionally guaranteed right to an education.

■■■ Nevertheless, there are a number of courts that have found that academic suspensions from state institutions can rise to a substantive due process violation if the actions of the state institution can be "shown to be clearly arbitrary or capricious." *See Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 91, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978) (reviewing cases that have implied that school suspensions can be reviewed under substantive due process standards). Even assuming that Koeppel has a fundamental right to continue his education at Valencia, the actions of Defendants do not constitute a violation of Koeppel's substantive due process rights. The substantive due process doctrine prevents the government from engaging in conduct that is "arbitrary or conscience shocking." *Doe v. Braddy*, 673 F.3d 1313, 1318 (11th Cir. 2012) (per curiam). The Court finds that the actions of Defendants in this case are neither "arbitrary" nor "conscience shocking." Koeppel was charged with serious school disciplinary offenses that threatened the safety of another Valencia student. Koeppel was given an opportunity to present his version of the facts, and in doing so admitted to the alleged misconduct. Defendants' decision to suspend Koeppel based on these facts is not, in any way, "conscience shocking." Accordingly, Koeppel's substantive due process claim fails and Defendants are entitled to summary judgment on Count IV as well.

## C. Count V—Flawed Procedure and Erroneous Outcomes

Title IX provides: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Neither the Supreme Court nor the Eleventh Circuit

has yet set forth a framework for analyzing challenges to university disciplinary proceedings brought under Title IX. Both parties, therefore, cite to the framework established by the Second Circuit Court of Appeals in *Yusuf v. Vassar College*, 35 F.3d 709 (2d Cir. 1994).

■ In *Yusuf*, the Second Circuit held that Title IX "bars the imposition of university discipline where gender is a motivating factor in the decision to discipline." *Id.* at 715. The court identified two general categories of Title IX challenges to university disciplinary proceedings: challenges to the penalty imposed; or challenges that "the plaintiff was innocent and wrongly found to have committed an offense," referred to as "erroneous outcome" challenges. *Id.* In this case, Koeppel claims that Defendants are liable under Title IX for an "erroneous outcome."

■ The *Yusuf* Court outlined a two-step inquiry for analyzing erroneous outcome claims. First, "[p]laintiffs who claim that an erroneous outcome was reached must allege particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding. If no such doubt exists based on the record before the disciplinary tribunal, the claim must fail." *Id.* Examples of such facts include "procedural flaws affecting the proof" or "evidentiary weaknesses behind the finding of an offense such as a motive to lie on the part of the complainant or witnesses, particularized strengths of the defense, or other reason to doubt the veracity of the charge." *Id.* Second, the plaintiff must also "allege particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding." *Id.* Examples include "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *Id.*

Koeppel has not submitted any facts that would cast articulable doubt on the accuracy of the disciplinary proceeding. The Committee determined that Koeppel committed the charged offenses after Koeppel admitted to sending the egregious text messages. Indeed, Koeppel still does not deny that he sent the text messages nor does he deny that the content was sexual, crass, and inappropriate. (Doc. 125, p. 4) ("It is undisputed that, in the text messages he sent, Plaintiff said a number of inappropriate things. Some were crass and others contained sexual references. Plaintiff regrets sending these text messages, but does not dispute that he sent them."). Koeppel still maintains, however, that he was wrongly found to have committed the offenses because his behavior did not constitute a violation of Valencia's Code of Conduct. For example, Koeppel claims that his conduct does not constitute a violation of the Student Code of Conduct because it did not "affect the College Community" and he did not "interfere with Jane's performance." He further argues that he did not "create an intimidating, hostile, or offensive College environment." (Doc. 92, p. 18).

These arguments fail to sufficiently cast doubt on the accuracy of the outcome of the disciplinary proceeding and merely demonstrate Koeppel's dissatisfaction with the Committee's determination. After Koeppel admitted to sending Jane the offensive text messages—which he continued to send even after the school issued the "No Contact Order"—the Committee reviewed the text messages as well as Jane's complaint and statements and determined that Koeppel's conduct presented a threat to Jane's health and safety and constituted a violation of Valencia's Code of Conduct. Koeppel has made no allegation, and has presented no evidence, that would suggest the Committee's determination was the product of "procedural flaws affecting the

proof" or "evidentiary weaknesses ... such as a motive to lie on the part of the complainant or witnesses, particularized strengths of the defense, or other reason to doubt the veracity of the charge." *Yusuf*, 35 F.3d at 715.

There being no articulable doubt as to the accuracy of the disciplinary proceeding in this case, Defendants are entitled to summary judgment on Count V.

## D. Counts VII & IX—Violation of the First Amendment

In Counts VII and IX, Koeppel challenges the constitutionality of Valencia's Policies and Procedures under the First Amendment of the United States Constitution. Koeppel moves for partial summary judgment on both of his First Amendment claims, arguing that he should prevail as a matter of law because "it is constitutionally impermissible for a public college to punish speech so far removed from the educational setting." (Doc. 125, pp. 7–8). Specifically, Koeppel makes the following arguments in support of his motion for summary judgment: (1) colleges cannot punish off-campus speech; (2) Valencia's policies regarding sexual harassment are unconstitutionally overbroad; and (3) Valencia's policies regarding sexual harassment are unconstitutionally vague. Defendants also move for summary judgment on the First Amendment claims, arguing that Koeppel's suspension does not implicate the First Amendment. The Court will address each of these arguments in turn.

### 1. Whether Valencia's Regulation of Off-Campus Speech is Unconstitutional

The First Amendment of the Constitution provides, in part, that "Congress shall make no law ... abridging the freedom of speech." U.S. Const. Amend I.[2] Freedom of speech is especially important in the university setting, "where the State acts against a background and tradition of thought and experiment that is at the center of our intellectual and philosophic tradition." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 835, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995). The Supreme Court has thus held that a student's right to freedom of expression must be vigilantly protected, both in and out of the classroom. *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 512, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) ("A student's rights, therefore, do not embrace merely the classroom hours. When he is in the cafeteria, or on the playing field, or on the campus during the authorized hours, he may express his opinions, even on controversial subjects."). This protection is not without limits, however; "[c]onduct by the student, in class or out of it, which for any reason ... materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech." *Id.* at 513, 89 S.Ct. 733.

Koeppel claims that his text messages did not materially or substantially interfere with school operations, and that Valencia is thus not constitutionally authorized to discipline based on his text messages. Koeppel appears to base this argument on the holding from *Murakowski v. University of Delaware*, 575 F.Supp.2d 571 (D. Del. 2008), where the district court found that a university could not limit a student's off-campus internet postings, even when those postings contained "racist, sexist, homophobic, insensitive, [and] degrading" content. *Id.* at 590.

---

**2.** The First Amendment's prohibition is applied against the States through the Fourteenth Amendment's Due Process Clause. *Schneider v. New Jersey*, 308 U.S. 147, 160, 60 S.Ct. 146, 84 L.Ed. 155 (1939).

This holding is in line with a string of cases where courts have been hesitant to allow regulation of student's off-campus internet activity. *See, e.g., Latour v. Riverside Beaver Sch. Dist.*, No. Civ. A. 05-1076, 2005 WL 2106562, at *2 (W.D. Pa. Aug. 24, 2005); *Emmett v. Kent Sch. Dist. No. 415*, 92 F.Supp.2d 1088, 1089 (W.D. Wash. 2000); *Beussink v. Woodland R–IV Sch. Dist.*, 30 F.Supp.2d 1175, 1177 (E.D. Mo. 1998). In all of these cases, the courts found that students' off-campus internet speech was protected by the First Amendment. Importantly, each of the courts analyzed the cases under the *Tinker* standard for material or substantial disruption and found that the students' speech in those cases did not materially or substantially disrupt school operations or interfere with the rights of other students.

Conversely here, Koeppel has not been charged with posting offensive speech on the internet. Instead, he has been disciplined for harassing a fellow student by sending a barrage of inappropriate, sexual, and threating text messages. Koeppel's speech was directed toward an individual student and was found by the Committee to be intimidating, hostile, offensive, and threatening. Such speech—whether on-campus or off-campus—is simply outside the protections of the First Amendment because it disrupts another student's ability to pursue her education in a safe environment. This determination is supported by the well-established principle that certain types of speech are not protected by the First Amendment. As explained by the Supreme Court:

> There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or "fighting" words— those which by their very utterance inflict injury or tend to incite an immedi-

ate breach of the peace. It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.

*Chaplinsky v. New Hampshire*, 315 U.S. 568, 571–72, 62 S.Ct. 766, 86 L.Ed. 1031 (1942) (footnotes omitted). The Court finds that Koeppel's speech in this case is exactly the kind of speech described by the Supreme Court in *Chaplinky*. It was texted to Jane in order to intimidate her and contained words "of such slight social value ... that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." *Id.*

Even assuming, however, that Koeppel's speech is fully protected, the Court still finds that Valencia's disciplinary action in this case does not run afoul of the First Amendment. Valencia has a compelling interest in proscribing conduct that affects its students, their safety, and their ability to learn in a safe and secure environment. Such an interest has been long supported by the Supreme Court, which has repeatedly emphasized the need for affirming the authority of the states and of school officials to regulate conduct in the nation's schools. *See e.g., Healy v. James*, 408 U.S. 169, 184, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972) ("[A] college has a legitimate purpose in preventing disruption on the campus ...."); *Epperson v. Arkansas*, 393 U.S. 97, 104, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968) ("Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems ...."). In this case, Koeppel's text messages caused a disruption in another student's ability to feel safe and secure in her continuing education at Va-

lencia. Jane reported to both the school and to Deputy Rush that she was afraid to continue to attend classes that she knew Koeppel was enrolled in. Koeppel's off-campus speech therefore affected the on-campus environment. Valencia's interest in protecting its students and its on-campus learning environment outweighs any First Amendment protections that Koeppel claims he has in sending text messages to Jane.

The Court therefore finds that Valencia's regulation of Koeppel's off-campus speech in this case survives scrutiny under the First Amendment.

### 2. Whether Valencia's Sexual Harassment Policy is Overbroad

Koeppel next argues that Valencia's policy governing sexual harassment is unconstitutionally overbroad. It is fundamental that regulations restricting the exercise of free speech must be narrowly drawn. *Broadrick v. Oklahoma,* 413 U.S. 601, 611, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973) The Supreme Court has allowed challenges to government regulations that potentially affect both protected as well as unprotected speech. *Massachusetts v. Oakes,* 491 U.S. 576, 581, 109 S.Ct. 2633, 105 L.Ed.2d 493 (1989) (plurality opinion) ("The [overbreadth] doctrine is predicated on the danger that an overly broad statute, if left in place, may cause persons whose expression is constitutionally protected to refrain from exercising their rights for fear of criminal sanctions."). Thus, under the overbreadth doctrine, a regulation "is unconstitutional on its face if it prohibits a substantial amount of protected expression." *Ashcroft v. Free Speech Coal.,* 535 U.S. 234, 244, 122 S.Ct. 1389, 152 L.Ed.2d 403 (2002).

To support his overbreadth argument, Koeppel cites to *DeJohn v. Temple University,* 537 F.3d 301 (3d Cir. 2008). There, the plaintiff filed suit against Temple Uni-

versity arguing that the following university policy governing sexual harassment was overbroad:

> For all individuals who are part of the Temple community, all forms of sexual harassment are prohibited, including ... expressive, visual, or physical conduct of a sexual or gender-motivated nature, when ... (c) such conduct has the purpose or effect of unreasonably interfering with an individual's work, educational performance, or status; or (d) such conduct has the purpose or effect of creating an intimidating, hostile, or offensive environment.

*Id.* at 305. The plaintiff complained that, because of the harassment policy, "he felt inhibited in expressing his opinions in class concerning women in combat and women in the military." *Id.*

The *DeJohn* Court began its analysis by explaining that "there is no 'harassment exception' to the First Amendment's Free Speech Clause; that is, 'we have found no categorical rule that divests harassing speech, as defined by federal anti-discrimination statutes, of First Amendment protection.'" *Id.* at 316 (quoting *Saxe v. State Coll. Area Sch. Dist.,* 240 F.3d 200, 210 (3d Cir. 2001) (footnote omitted)). The Court found the policy at issue in *DeJohn* overbroad because the policy focused on the *motive* of the speaker and not just the effect the speech had on the learning environment. *Id.* at 317. The Court reached this conclusion through a careful application of the Supreme Court's ruling in *Tinker,* which requires that a school must show that speech will cause a material or substantial disruption before prohibiting it. *Id.; see also Tinker,* 393 U.S. at 509, 89 S.Ct. 733. Temple's inclusion of regulation based on the speaker's intent was "contrary to *Tinker's* requirement that speech cannot be prohibited in the absence of a

tenable threat of disruption." *DeJohn*, 537 F.3d at 317.

It is important to note, however, that the *DeJohn* Court did not suggest that all anti-harassment policies violate the First Amendment. Indeed, the Third Circuit has previously emphasized that "preventing discrimination in the workplace—and in schools—is not only a legitimate, but a compelling, government interest." *Saxe*, 240 F.3d at 210. And, importantly to the case at hand, the Court suggested that Temple's policy could have provided shelter for protected speech if it "contained a requirement that the conduct objectively and subjectively create[d] a hostile environment, or substantially interfere[d] with an individual's work." *DeJohn*, 537 F.3d at 318.

In analyzing Valencia's sexual harassment policy, the Court notes that Koeppel was not disciplined for his intent or motive to commit harassing speech, but rather for engaging in harassing speech that had the effect of substantially interfering with another student's ability to continue her education at Valencia. Unlike the facts in *DeJohn*, where the student complained of feeling inhibited in expressing himself because of the university's harassment policy, the harassing speech in this case falls well within the *Tinker* framework for the type of speech that a school may prohibit because it materially and substantially interfered with the rights of another student. Moreover, Valencia's policy differs from Temple's policy in that it contains language that limits the reach of types of speech the policy can regulate.[3]

Based on the language of the policy, Valencia can only regulate harassing speech that "is sufficiently serious, pervasive, or persistent as to create an intimidating, hostile, humiliating, demeaning, or sexually offensive working, academic, or social environment under both an objective (a reasonable person's) and subjective (the Reporting Party's) view." (Doc. 131–2, p. 4). This limiting language is precisely the type of language that the Third Circuit suggested would "provide shelter for core protected speech." *DeJohn*, 537 F.3d at 318. Because Valencia's policy provides language that sufficiently shelters protected speech, the Court finds that the policy is not unconstitutionally overbroad.

### 3. Whether Valencia's Sexual Harassment Policy is Vague.

A statute or policy is unconstitutionally vague if it "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits," or "if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000).

Koeppel claims that Valencia's sexual harassment policy is unconstitutionally vague because the policy gives no objective guidelines as to what would create an "intimidating, hostile, humiliating, demeaning, or sexually offensive working, academic, or social environment." (Doc. 125, p. 19). In support of his vagueness argument, Koeppel cites to two cases

---

**3.** Valencia's sexual harassment policy defines sexual harassment as follows:

> Any unwelcome sexual advance, request for sexual favors, or other unwelcome verbal or physical conduct of a sexual nature, when, *inter alia*:
>> Such conduct has the purpose or effect of unreasonably interfering with an individual's work or academic performance, i.e.,

it is sufficiently serious, pervasive, or persistent as to create an intimidating, hostile, humiliating, demining, or sexually offensive working, academic, or social environment under both an objective (a reasonable person's) and subjective (the Reporting Party's) view.

(Doc. 131–2, p. 4)

where universities' sexual harassment policies were ruled unconstitutionally vague. *See Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1184 (6th Cir. 1995); *Booher v. Bd. of Regents, N. Ky. Univ.*, No. 2:96-CV-135, 1998 WL 35867183, at *9 (E.D. Ky. July 22, 1998). In both of the cases cited, however, the courts explained that the policies were impermissibly vague because they did not include a reference to "both subjective and objective measurement." *Booher*, 1998 WL 35867183, at *9. Without such references, "potential complainants ... may feel entitled to bring a charge of sexual harassment whenever they feel slighted by another member of the university community." *Id.* Unlike the policies in the cases Koeppel cites, Valencia's sexual harassment policy explicitly contains a reference to both an objective and subjective standard. (Doc. 131–2, p. 4). Accordingly, in order to be actionable under Valencia's sexual harassment policy an individual's conduct must be so severe that both the objective reasonable person and the subjective reporting party find the behavior offensive. This requirement precludes punishment for protected speech. Based on the inclusion of the objective and subjective standard, the Court finds that Valencia's sexual harassment policy sufficiently explains to a person of ordinary intelligence what conduct is prohibited.

Furthermore, Valencia's sexual harassment policy tracks closely with existing federal regulations governing sexual harassment in the workplace that have been found constitutional. *See* 29 C.F.R. § 1604.11(a)(3). In *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), the Supreme Court explained that "in order to be actionable under the statute [for sexual harassment in the workplace], a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact

did perceive to be so." *Id.* at 787, 118 S.Ct. 2275. This standard—that the conduct be both objectively and subjectively offensive—is the exact same standard found in Valencia's policy. If this standard is constitutionally sufficient for workplace sexual harassment policy, it should likewise be sufficient for the sexual harassment policies of colleges and universities.

Based on the foregoing, the Court finds that Koeppel's First Amendment claims fail as a matter of law and that Defendants are entitled to summary judgment on Counts VII and IX.

## IV. CONCLUSION

For the aforementioned reasons, it is **ORDERED AND ADJUDGED** as follows:

1. Defendants' Motion for Summary Judgment (Doc. 79) is **GRANTED**.

2. Plaintiff's Motion for Partial Summary Judgment (Doc. 125) is **DENIED**.

3. The Clerk of Court is **DIRECTED** to enter judgment in favor of Defendants and against Plaintiff.

4. The Clerk of Court is **DIRECTED** to terminate all pending motions and to close the file.

**DONE AND ORDERED** in Orlando, Florida, on May 11, 2017.